[Crim. No. 37910. Second Dist., Div. Five. July 6, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL WILLIAM HUNT, Defendant and Appellant.

## COUNSEL

Daniel Jonathan Arnold, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz and Stephen F. Kaufmann, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CHOATE, J.*—

### STATEMENT OF THE CASE

Defendant was convicted by a jury of counts I and II, burglaries, first degree (Pen. Code, § 459), count III, attempted voluntary manslaughter (Pen. Code, §§ 664/193) as a lesser but included offense of assault with an intent to commit murder (Pen. Code, § 217), and count IV, simple assault (Pen. Code, § 240) as a lesser included offense of assault with intent to commit rape (Pen. Code, § 220). Enhancement allegations to count II and count IV for great bodily injury (Pen. Code, § 12022.7) and great bodily injury to a person 60 years (Pen. Code, § 1203.09) were found true.

Probation was denied and defendant was sentenced to an unstayed prison term of nine and two-thirds years. That term included a consecutive sentence on count I, burglary, for which the trial court incorrectly used the low term of two years, rather than the middle term required by the Penal Code for consecutive sentences. Five days later the court called the case again, announced its error in calculating the sentence, and sentenced defendant to an unstayed term of ten and one-third years, as follows: On count I, burglary first degree, a consecutive one-third of the four-year middle term; that is, sixteen months, or one and one-third years; count II, burglary first degree, a six-year, high base term enhanced by a three-year consecutive term for great bodily injury; and count III, attempted voluntary manslaughter, a low base term of one year, concurrent with other terms.

Defendant appeals from the judgment and sentence.

---

*Assigned by the Chairperson of the Judicial Council.

## FACTS

The evidence disclosed that on the night of August 8, or the early morning hours of August 9, 1979, defendant broke a window to enter the Cottrill apartment and took a television set and tape recorder, which he removed to his own nearby apartment. He then similarly entered an apartment across the street from the first, where he assaulted the occupant, 72-year old Anita Mora. When defendant left that apartment he was pursued by a police officer who observed him vault two fences and run away down a nearby ravine.

Police entering the Mora apartment found her unconscious, with severe injuries to her face and head. Her nightgown had been pushed up around her head and a pillow placed over her face. The officers found broken window glass on the floor, defendant's fingerprint on the metal rail of a screen to the sliding glass door, and bloodstains on Mrs. Mora's nightgown.

John Minerva, who was granted immunity, testified that he had been with defendant earlier on the evening of August 8th, and when they parted Minerva had driven home. Defendant appeared at Minerva's home after 2 a.m., with his shoes muddy and with abrasions on his arms and legs. He told Minerva that he had broken his arm. He admitted to Minerva that he had entered an apartment across the street from his house and had hit the lady who walked in on him. He said that he had fallen from a fence while trying to escape the police. Minerva, at defendant's request, later disposed of the television set taken in the Cottrill burglary.

The defendant testified that he was heavily intoxicated from pills and marijuana when Minerva drove him home. He fell on the sidewalk and broke his arm and Minerva helped him walk into the house. After putting an icepack on his own arm, he heard Minerva call him from the Cottrill apartment, where he refused to assist Minerva who was carrying out a television set. Later he walked across the street to the Mora apartment when Minerva called him. He entered, saw Mrs. Mora and fled through a window. He later drove Minerva's auto from near the crime scene to Minerva's home and left his damaged clothing with Minerva.

## CONTENTIONS ON APPEAL

Defendant asserts as grounds for his appeal:

1. Insufficiency of the evidence at the preliminary hearing should have resulted in dismissal in his motion under Penal Code section 995.

2. His motion to dismiss as a sanction for destruction of evidence by the prosecution should have been granted.

3. His motion to appoint a psychiatrist to assist him in selection of a jury should have been granted.

4. Opinion testimony to establish the bizarre or unusual nature of the Mora burglary should have been permitted to show defendant's diminished capacity.

5. Testimony regarding acts and conduct of John Minerva to show his violent character should have been permitted.

6. Photographs of the victim, Mrs. Mora, were unduly prejudicial to him and should not have been received.

7. The prosecution's fingerprint expert should not have been permitted to testify to identification of defendant's print.

8. Defendant's letters, sent to his fiancee from jail, should not have been received in evidence.

9. The trial court misused sentencing rules criteria in sentencing to consecutive and enhanced terms.

10. The trial court should have dismissed one of the assault counts, because the assaults were a single course of conduct.

11. Having sentenced the defendant the court should not have recalled him to increase the sentence.

## DISCUSSION

### 1. *The Motion Under Penal Code Section 995*

Penal Code section 995 provides that an information must be set aside when the defendant has been committed without reasonable or

probable cause. Defendant complains that his motion under that section was improperly denied. When a superior court denies the motion to set aside, a writ of prohibition may be filed under Penal Code section 999a. Defendant did not file such a petition. The case proceeded to trial and defendant was convicted with sufficient evidence to support the judgment. The defendant's contention that there was insufficient evidence to find reasonable and probable cause to commit him for trial is, therefore, moot. "'If there is insufficient evidence to support the commitment the defendant cannot be said to be prejudiced where sufficient evidence has been produced at this trial to support the conviction.'" (*People* v. *Hampton* (1981) 116 Cal.App.3d 193 [172 Cal.Rptr. 25]; *People* v. *Chambers* (1980) 108 Cal.App.3d 985, 991 [166 Cal.Rptr. 815].)

## 2. *The "Hitch" Motion to Dismiss*

■ Defendant unsuccessfully moved pursuant to *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361] to dismiss the information as a result of a police officer's destruction of notes and papers which defendant claimed would have been helpful to his defense. Testimony of the officer was that when he arrived at the Mora house at about 2 a.m., he wrote down the license numbers of three or four automobiles parked nearby. He read the numbers over the police radio to the dispatcher and was given a Department of Motor Vehicles' report on ownership of the cars. He recalled that none of them was registered to John Minerva. He knew Minerva's car but did not see it there. Later, at 7 a.m., he returned and wrote down 30 or 40 more license numbers on a piece of paper and returned to the police station with that paper. He ran a check of Department of Motor Vehicles automobile registrations on those numbers. None of them was registered to Minerva.

He testified at the preliminary hearing that he thought his lists and the teletype sheets were then in his desk, but he realized later that he had thrown them away. The trial court found that "[O]fficer Harper did not deliberately destroy anything that he [reasonably] could have anticipated would be helpful to the defense." The record and another remark of the court about "destruction of things which might have appeared at the time to be useless to anybody" reflect a finding that the destruction was intentional but not malicious.

The importance of the lists, it is suggested, is that had they been available, defendant could have impeached Minerva's testimony that he

dropped the defendant off at defendant's house and drove the car home. The presence of Minerva's automobile near the scene of the crimes, defendant claims, would have refuted Minerva's story that defendant was the sole perpetrator of the crimes.

The intentional but nonmalicious destruction of evidence by the police justifies the imposition of sanctions short of dismissal, if there is a reasonable possibility that the evidence would have been favorable to the defense. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 755 [175 Cal.Rptr. 738, 631 P.2d 446]; *People* v. *Hitch, supra*, 12 Cal.3d 641, 653.)

Imposition of a reasonable sanction for the destruction of evidence may be warranted in some instances, but if the police acted in good faith, that is, without a malicious intent, the burden is on the defense to prove that there was substantial materiality in the destroyed material. (*People* v. *Ammons* (1980) 103 Cal.App.3d 20, 32-33 [162 Cal.Rptr. 772].) Defendant in the present case has not succeeded in showing that the lists of license numbers and registrations would have been material for any purpose. He has not shown "a reasonable possibility that they would constitute favorable evidence on the issue of guilt or innocence." (*People* v. *Hitch, supra*, 12 Cal.3d 641, at p. 649.) He suggests that even though none of the vehicles was registered to Minerva, perhaps Minerva's vehicle had been recently purchased and the Department of Motor Vehicles had not been notified of the change in ownership. The hypothesis simply asked the court to speculate. We find no error in the refusal to dismiss or to apply other sanctions.

### 3. *The Refusal of the Court to Appoint a Psychiatrist to Assist in Jury Selection*

■ The court denied a motion to appoint a psychiatrist at public expense to assist defense counsel in the selection of jurors who would not be irrationally swayed by the viciousness of the attack upon Mrs. Mora. Defendant, an indigent, contends the ruling was error in that it deprived him of equal protection of the law.

Evidence Code section 730 permits appointment of experts by the court, when it appears to the court that expert evidence is or may be required, but the decision to do so lies with the court. (*Torres* v. *Municipal Court* (1975) 50 Cal.App.3d 778, 784 [123 Cal.Rptr. 553].)

Equal protection requires, where there is a showing of necessity, that the court appoint experts needed to assist an indigent. (*People v. Faxel* (1979) 91 Cal.App.3d 327, 330 [154 Cal.Rptr. 132]; *People v. Torres, supra*, 50 Cal.App.3d 778.) In the instant case, however, no proof was submitted to the trial judge, so far as the record reflects, of a need for the psychiatrist. The trial court could not presume, nor do we, that a psychiatrist is any more qualified to select a certain type of juror than is a trial lawyer who knows the evidence and the issues, as the record shows defendant's counsel did. We find no abuse of discretion in the denial of the motion.

4. *The Opinion that the Burglary was Bizarre or Unusual*

■ Defendant admitted his presence in the Mora residence but relied in part upon a defense of diminished capacity to form the mental state required for the charged crimes. He contends, therefore, that it was error to sustain an objection to a question put on cross-examination to one of the police officers who entered the Mora premises as to whether the physical evidence at the scene was unusual or bizarre. The objection was sustained under Evidence Code section 352. Although there was no offer of proof, defendant's theory is that the officer, an expert investigator of many burglaries, could have confirmed that only a person suffering the effects of substantial intoxication would have exited from the Mora apartment as defendant claimed he did, smashing out a glass rather than leaving through a door. The court sustained the objection after conducting a hearing and finding that the inquiry would prove too time-consuming. The officer had investigated about 300 other burglaries, and had the court permitted the cross-examination to take off in the direction requested, the redirect examination may have been extensive.

The jury had been made aware in minute detail of the physical evidence. We doubt that expert opinion was called for to assist the jurors in weighing whether it was unusual conduct to exit through a glass rather than to open a door.

We find no abuse of discretion in the court's sustaining of the objection.

## 5. *Evidence of Acts and Conduct of John Minerva*

■ During direct examination of defendant the court sustained an objection to the following question:

"Q: Have you observed John Minerva to become violent?"

No grounds were stated for the objection, but the court ruled, "Sustained on the present foundation." Another question followed:

"Q: Have you ever been out with John Minerva when any kind of argument or disagreement ensued?"

The prosecutor asked to approach the bench and a conference was held in chambers. In the chambers, an objection was made on the ground of relevance. Defense counsel explained that because Minerva and defendant each accuse the other of the assault upon Mrs. Mora, he should be allowed to present evidence of Minerva's character and propensity for violence. This, he argues, would suggest that Minerva, not he, was the assailant.

The court stated that it would not preclude questions on the subject, but would require an informal memorandum of authorities from defendant before permitting further examination concerning Minerva's character. The line of questioning was not resumed, and so far as the record shows, no points and authorities were presented.

"With certain exceptions, 'evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion.'" (Witkin, Cal. Evid. (2d ed. 1966) § 324, p. 287; Evid. Code, § 1101 subd. (a).) The court's rulings were correct in regard to the questions asked. Defense counsel apparently decided to abandon the line of inquiry rather than submit a memorandum on admissibility of the evidence. The point is, therefore, not available to defendant on appeal. (*People* v. *Coleman* (1970) 8 Cal.App.3d 722, 730 [87 Cal.Rptr. 554].)

## 6. The Photographs of the Victim

■ Four photographs of Mrs. Mora were admitted over defense objection, the trial court having found that they were not gruesome and that they were probative of the question of whether the victim had been assaulted by means of force likely to produce great bodily injury. They were color photographs taken prior to and while emergency medical treatment was administered to the victim. The photos show blood and severe facial injury. Defendant argues that the prejudicial effect on the jury outweighed the probative value of the exhibits.

"Whether 'the probative value of photographs offered into evidence outweighs the possible prejudicial effect is a question for the trial court in the exercise of its judicial discretion.'" (*People* v. *Terry* (1970) 2 Cal.3d 362, 403 [85 Cal.Rptr. 409, 466 P.2d 961].) In the instant matter the court expressed the view that the pictures were not gruesome. Their probative value is clear in their reflection upon the assault charges and the bodily injury enhancements alleged. There was no abuse of discretion in the ruling. (*People* v. *Robles* (1970) 2 Cal.3d 205, 214 [85 Cal.Rptr. 166, 466 P.2d 710].)

## 7. The Fingerprint Identification Testimony

■ On direct examination a Ventura County Sheriff's Department fingerprint identification technician, Robert Boyd, was asked this virtually unintelligible question:

"Q: What you are saying is that over seven [we assume that this means seven points of similarity between a fingerprint found at the crime scene and one taken from a suspect after arrest] you are satisfied that your experience with the literature and your own personal experience completely obliterates the possibility of there being the same person?

"MR. ARNOLD: Objection, that calls for an opinion. There has been no foundation.

"THE COURT: Overruled. You can answer it.

"THE WITNESS: That's correct. In my opinion where I have seven points of similarity and no unexplained dissimilarities there is just an

astronomical figure involved that there could be any chance that it wouldn't be the same person."

The expert then testified without objection that the print taken from the rail of the screen of Mrs. Mora's sliding glass door, and the print he had personally rolled from defendant's hand after arrest were from the same person.

There was no challenge to the expertise of the witness. Several questions earlier in the examination he had testified, without objection, that he required seven points of similarity to make a positive identification. His background was extensive: eight years in law enforcement, four of which were in fingerprint classification and identification; courses of study with the F.B.I., Los Angeles County Sheriff, Los Angeles Police and the California Department of Justice. He had made a personal comparison of over 250,000 prints. The witness also recounted his studies of the instances wherein positive identifications had been made with lesser numbers of points of similarity than seven. He testified: "To my knowledge there is no minimum number of points that are required to make a positive identification. However, there are minimums that are established by each examiner and my personal preference is seven. And those seven points it must be a clear latent print that I am working with or else I will not make an identification on it."

The objection that the question called for an opinion was properly overruled. It was within the discretion of the trial judge to determine competency of the witness to state an opinion. (*People* v. *Clark* (1970) 6 Cal.App.3d 658, 664 [86 Cal.Rptr. 106]; Jefferson, Cal. Evid. Bench Book, § 29.3, p. 501.) "[E]vidence of scientific tests is admissible when the technique has received general acceptance by recognized experts in the field." (*People* v. *Marx* (1975) 54 Cal.App.3d 100, 109 [126 Cal.Rptr. 350, 77 A.L.R.3d 1108].) Regarding the objection of lack of foundation, this case is not one, as defendant contends, where the prosecution relied upon erroneous statistical evidence as in *People* v. *Collins* (1968) 68 Cal.2d 319, 332 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176]. In the instant case the print taken from the crime scene and that taken from the defendant's finger were in evidence and were verifiable. The techniques and methods of fingerprint identification were explained. There was no reliance upon numbers except that the witness used the word "astronomical" in describing the probability that another person's print might possess the same identified characteristics of the defendant's print. It was proper for the witness to consider

the extent of the possibility that another man's print might have the same peculiar features. There was no lack of foundation, no "trial by mathematics" (*People* v. *Marx, supra,* 54 Cal.App.3d 100, 113), and no error in admitting the evidence.

## 8. *Defendant's Letters*

Defendant contends that letters he wrote to his fiancee, Miss Van Winkle, while he was in county jail awaiting trial were inadmissible over his objection. The district attorney offered them to show defendant's consciousness of guilt in that the letters sought to have Miss Van Winkle concoct false testimony for him.

The letters had come to the hands of the district attorney through defendant's fellow inmate, James O. Smith, who acted as carrier, using his pro per status to smuggle them out of the jail. The defendant naively entrusted them to Smith, who seized the opportunity to present them to his jailers. Other letters were delivered to the prosecution by Van Winkle's father who entered her room in the family home to take them, and four were recovered from her room by means of a search warrant. The affidavit in support of the warrant was based upon letters acquired from the father, from Smith, and Smith's information concerning their contents.

■ Defendant's first point is that he and Miss Van Winkle were parties to a relationship which he describes as "tantamount to marriage." He thus claims the privilege under Evidence Code section 980,[1] which grants a spouse the privilege not to disclose a communication between him and the other spouse while they were husband and wife. The privilege, founded upon a policy of promoting marital harmony (Witkin, Cal. Evid. (2d ed. 1966) § 838, p. 782) has not been extended to unmarried persons living together, or in a status "tantamount to marriage". We do not so extend it.

■ Defendant complains of the admission of the letters as unduly prejudicial, arguing that they should have been excluded under Evidence Code section 352. That section permits the court to exclude

---

[1]Section 980 provides that "Subject to Section 912 [waiver] and except as otherwise provided in this article, a spouse ... has a privilege ... to refuse to disclose, and to prevent another from disclosing, a communication if he claims the privilege and the communication was made in confidence between him and the other spouse while they were husband and wife."

evidence when its probative value is substantially outweighed by the danger that its admission will create, inter alia, undue prejudice. Whether evidence should be excluded is within the discretion of the trial court. (*People* v. *Demond* (1976) 59 Cal.App.3d 574, 586 [130 Cal.Rptr. 590].) The letters were probative in that by urging his fiancee to give false testimony they showed defendant's consciousness of guilt. There was no abuse of discretion.

Another of defendant's arguments directed to admission of the letters is that they reveal that he was in county jail when he wrote them, thus creating undue prejudice in the minds of jurors. We think it unreasonable to assume that jurors are not aware that in most instances of felony proceedings it is necessary for an accused to be in custody, at least temporarily. We see no reason to assume that jurors would be prejudiced at finding that this was true of the defendant. We are aware that physical restraints kept on a defendant during trial may prejudice him in the minds of the jurors (*People* v. *Duran* (1976) 16 Cal.3d 282, 290 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]), and that a defendant may not be required to be tried in jail clothing (*People* v. *Du Bose* (1970) 10 Cal.App.3d 544, 549 [89 Cal.Rptr. 134]; *People* v. *Zapata* (1963) 220 Cal.App.2d 903, 910-911 [34 Cal.Rptr. 171]). But disclosure to the jury through the letters that defendant was in jail when he wrote them does not seem to us to pose the same potential for prejudice as would shackles, handcuffs or jail denims. The trial court instructed the jury, "You must not suffer yourselves to be biased because of the fact that he has been arrested for the offenses. . . ." There was no request by defendant to amplify the warning against bias or prejudice. But we believe that such amplification was unnecessary in the state of the record. We find no undue prejudice and no abuse of discretion in the ruling.

█ Defendant argues that the letter used in the affidavit supporting the search warrant was illegally obtained by Miss Van Winkle's father who took it from her room. The Fourth Amendment protection against unreasonable search and seizure, however, is directed against governmental action. The use of evidence procured by a private citizen without governmental complicity is not prohibited. (*People* v. *Baker* (1970) 12 Cal.App.3d 826, 834 [96 Cal.Rptr. 760].) Although Miss Van Winkle was an adult, her father, in obtaining the defendant's letter from her room, was acting as a concerned parent. The findings of the court in the hearing to suppress the letters indicate that there was no suggestion by the district attorney or police that the father take the let-

ters. Accordingly, the letter was not produced through governmental complicity but solely by a private citizen, and the Fourth Amendment prohibition does not apply. (*People v. Scott* (1974) 43 Cal.App.3d 723, 726 [117 Cal.Rptr. 925]; *People v. Wolder* (1970) 4 Cal.App.3d 984, 993 [84 Cal.Rptr. 788].)

Defendant complains that there was an expectation of privacy in trusting possession of his letters to his jailmate, James Smith, who passed them on to the sheriff. He contends that Smith's breach of confidence led to illegal acquisition of the letters by the district attorney and they should have been suppressed. The evidence was that Smith volunteered the information defendant was sending letters and gave copies of the letters to the prosecution. The contents of the letters were known to Smith, who had helped to write them. In delivering the letters to Smith and trusting him to smuggle the letters out of jail, defendant undoubtedly hoped for confidentiality. He claims that he exhibited a reasonable expectation of privacy and cites *North v. Superior Court* (1972) 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155] in support.

The general rule is that an inmate at a jail has no right to privacy. The reasoning is that jail authorities should be able to employ reasonable security measures. Lack of privacy is a built-in aspect of imprisonment, with censorship and control of communications to and from a jail """"inherent in its administration. Such authority is necessary to protect against escape."""" (*North v. Superior Court, supra,* 8 Cal.3d 301, 309, quoting *People v. Morgan* (1961) 197 Cal.App.2d 90, 93 [16 Cal.Rptr. 838].) The *North* opinion recognizes that there are exceptions to the general rule which protect the confidentiality of conversations between a prisoner and his attorney, or religious adviser or doctor. It noted that in a jail or prison setting an "ordinary conversation between spouses could not be deemed to have been 'made in confidence' as required by Evidence Code section 980 to establish the privilege." (*Id.* at p. 311.) But the husband-wife conversation in *North* occurred in a private office after a detective had led North and his wife there, exited and closed the door, leaving them alone to talk. The *North* court found that the couple had been lulled into believing that their conversation would be confidential. A reasonable expectation of privacy having been engendered by those circumstances, the court suppressed a tape of their conversation as a breach of marital privacy. (*Id.,* at p. 313.) Defendant's reliance upon *North* misses several points. Aside from his unmarried status and the lack of confidentiality of the letters, he obvi-

ously had no reasonable expectation of privacy. That he chose to smuggle the letters out of the jail is an acknowledgement that defendant knew the letters were not protected by any privilege. There was no error in the introduction of the letters into evidence.

9. *Sentencing to Consecutive and Enhanced Terms*

■ Defendant contends that the burglary of the Cottrill residence (count I) and the Mora burglary (count II) were a single course of conduct which did not permit a consecutive sentence on count I. The court sentenced on count I to a term consecutive to count II after finding that the burglaries were independent offenses. California Rules of Court, rule 425(a)(1) permits consecutive terms when facts relating to the crimes show that "the crimes and their objectives were predominantly independent of each other." The evidence supported the conclusion that the Cottrill burglary was at an end when the loot was carried to defendant's home. There was no error.

■ Defendant also contends that the court erred in imposing the six-year upper-term on count II on the basis of his poor performance on probation. The court found that when the crime was committed defendant was on two separate grants of probation. We find no error in the use of California Rules of Court, rule 421(b)(4), which permits enhancement of a crime when it is committed while an offender is on probation. And California Rules of Court, rule 421(b)(5), which allows upper-term enhancement when a prior performance on probation is unsatisfactory, was a properly used circumstance. In addition, there were other circumstances found by the court, any one of which would qualify in fixing the upper term if not also used to impose a consecutive term. (*People v. White* (1981) 117 Cal.App.3d 270, 282 [172 Cal.Rptr. 612].)

■ Contrary to defendant's next contention, we find no dual use of facts in the imposition of the consecutive term on the Cottrill burglary (count I) plus the enhancement pursuant to Penal Code section 12022.7, for infliction of great bodily injury. The court was obliged, pursuant to the section, to sentence to a consecutive term of three years when the jury returned with a finding that the enhancement charge was true. (Pen. Code, § 12022.7.) The record does not support defendant's claim that there was a dual use of the fact of great bodily injury in imposing a consecutive sentence. A reading of the record shows that the court retracted its reliance upon that circumstance as a basis for

sentencing to the upper term and relied upon the aggravating circumstances that the burglaries were independent crimes. There was no error in the selection and use of sentencing criteria.

 Defendant complains of error in a dual use of facts to deny probation and to enhance to the upper term in count II. There is no prohibition against such use and no error. California Rules of Court, rule 441(a) permits a fact used to deny probation to be used in imposing the upper term or for enhancement.

## 10. *The Simple Assault Conviction*

 In count IV defendant was charged with assault with intent to commit rape and the jury returned a verdict of a lesser but included offense of simple assault, a misdemeanor. The court did not sentence on the simple assault offense. In count III the defendant was charged with assault with intent to commit murder and the jury returned a guilty verdict of the lesser included offense of attempted voluntary manslaughter. Defendant argues that because the jury found no assault with intent to commit rape in count IV the attempted voluntary manslaughter should be dismissed.

His reasoning is that the finding by the jury of a simple assault, rather than an assault with a sexual motive, establishes that there was only one course of assaultive conduct. Therefore, he argues that his motion to dismiss the greater offense (count III) should have been granted. The record shows, however, that there was no motion to dismiss count III (attempted voluntary manslaughter). Defendant directed his motion to count IV (simple assault). The court reserved ruling on the motion but never granted or denied it. Apparently counsel and the court forgot about it. Because count III and count IV were both in existence at the time of sentence, we treat the motion as having been denied.

The People's theory as to why separate assaults were committed and charged is that the original entry into the Mora house was for theft, as it had been in the Cottrill burglary. The first assault, respondent argues, took place when Mrs. Mora surprised defendant in the house. Later, defendant undressed and was in intimate enough contact with the victim to stain his shorts with her blood and the circumstances suggest a sexual assault. Where evidence is susceptible, as we find it to be in the instant case, of an inference that there was an initial beating of the victim and the intent to commit the sex crime was formed after the

beating, we are obliged not to disturb a ruling of the court which supports a finding of two distinct courses of conduct. (*People* v. *Roth* (1964) 228 Cal.App.2d 522, 535 [39 Cal.Rptr. 582].) We find no error in the failure to dismiss either of the assault counts.

## 11. *The Resentencing*

On March 19, 1980, the court imposed a consecutive sentence for count I, burglary, first degree, of one-third of the two-year lower term. This Count I sentence was a mistake because it was contrary to Penal Code section 1170.1, subdivision (a), which requires that "The subordinate term for each consecutive offense which is not a 'violent felony' . . . shall consist of one-third of the *middle* term of imprisonment prescribed . . . ." (Italics ours.) The record reflects that on March 24, the court, having discovered its error, recalled the defendant for resentencing. It then imposed a consecutive sentence on count I, this time correctly using the middle term of four years set out in Penal Code section 461, and thus requiring the defendant to serve an additional eight months. Defendant complains that there was error in imposing the longer sentence. We disagree.

"When a court pronounces a sentence which is unauthorized by the Penal Code, that sentence must be vacated and a proper sentence imposed whenever the mistake is appropriately brought to the attention of the court." (*People* v. *Massengale* (1970) 10 Cal.App.3d 689, 693 [89 Cal.Rptr. 237].) "When an illegal sentence is vacated, the court may substitute a proper sentence, even though it is more severe than the sentence imposed originally". (*People* v. *Grimble* (1981) 116 Cal.App. 3d 678, 685 [172 Cal.Rptr. 362], citing *People* v. *Serrato* (1973) 9 Cal.3d 753 [109 Cal.Rptr. 65, 512 P.2d 289] and *In re Sandel* (1966) 64 Cal.2d 412 [50 Cal.Rptr. 462, 412 P.2d 806].) There was no error in the sentence of March 24.

The judgment is affirmed.

Stephens, Acting P. J., and Hastings, J., concurred.