**STATE of Iowa, Plaintiff-Appellee,**

v.

**Rick Dewayne NEBINGER, Defendant-Appellant.**

No. 85–1018.

Court of Appeals of Iowa.

June 24, 1987.

man, Asst. Scott County Atty., for plaintiff-appellee.

Heard by DONIELSON, P.J., and SNELL and SACKETT, JJ.

SNELL, Judge.

On March 15, 1985, the appellant, Rick Dewayne Nebinger, was charged by joint trial information with murder in the first degree, *see* Iowa Code §§ 707.1, 707.2 (1985), and robbery in the first degree. *See* Iowa Code §§ 711.1, 711.2 (1985). These charges were made in connection with the killing of seventy-nine-year-old Floyd Brown, whose body was found in a bedroom of his Davenport home. Brown had been bound and repeatedly stabbed. There was evidence that Brown's home had been robbed. Nebinger's codefendant, Christine Marie Lockheart, was charged along with Nebinger for the same crimes. The district court severed the defendants' trials. Following separate and simultaneous trials, both defendants were found guilty as charged. Nebinger was sentenced to concurrent terms of life imprisonment and twenty-five years. Although both defendants have appealed, Lockheart's separate appeal is not a concern of this opinion.

## I.

Nebinger contends the district court abused its discretion by refusing to grant his request for a change of venue. Nebinger argues the district court's abuse of discretion resulted in a denial of his right, grounded in the federal and state constitutions and in state statute, to a fair and impartial trial. Iowa Rule of Criminal Procedure 10(10)(b) provides in pertinent part as follows:

If the court is satisfied from a motion for a change of venue and the evidence introduced in support of the motion that such degree of prejudice exists in the county in which the trial is to be had that there is a substantial likelihood a fair and impartial trial cannot be preserved with a jury selected from that county, the court either shall order that the action be transferred to another county in which the offensive condition does not exist,

Kent A. Simmons of Liebbe & Simmons, Davenport, for defendant-appellant.

Thomas J. Miller, Atty. Gen., Christie J. Scase, Asst. Atty. Gen., and James Hoff-

..., or shall order that the trial jury be impaneled in and transferred from a county in which the offensive condition does not exist,....

Our review is a de novo determination of whether the trial court abused its discretion by ruling, in substance, that Nebinger failed to demonstrate a "substantial likelihood" he would not receive a fair and impartial trial in Scott County. *See State v. Chadwick*, 328 N.W.2d 913, 915 (Iowa 1983). Because Nebinger seeks reversal of his conviction on the basis of the district court's denial of his change of venue motion, he must show either actual prejudice on the part of the jury or that the publicity attending the case was so pervasive and inflammatory that prejudice must be presumed. *State v. Robinson*, 389 N.W.2d 401, 403 (Iowa 1986); *State v. Spargo*, 364 N.W.2d 203, 207 (Iowa 1985). Nebinger attempts to characterize his case as one in which prejudice must be presumed. In such cases the appropriate venue determination may be based on such evidence as qualified public opinion surveys, individual opinion testimony, or the court's evaluation of the nature, frequency, and timing of the material involved. *Pollard v. District Court of Woodbury County*, 200 N.W.2d 519, 520 (Iowa 1972).

Nebinger's motion was based upon the content of a radio talk show which aired between 8:30 a.m. and 10:00 a.m. on February 18, 1985, the morning after Nebinger was arrested. The topic of discussion for the call-in show was capital punishment. The moderator used an explicit factual description of the present crime as a premise in support of his conclusion that Iowa should reinstate the death penalty. Neither the defendant's nor the victim's name was used. Nebinger's criminal incarceration and treatment history, however, were discussed. As the State concedes in brief, and we find, a number of the comments made by the program moderator and callers were, in fact, inflammatory. For example, at one point during the program the moderator suggested that a fitting sentence in the present case would be to tie up the defendant in the courtroom and cut his throat, a demise similar to that suffered by the victim. The moderator also advocated the fairness of a return to a system where persons were dropped "thirteen feet through a trap-door by your neck." In addition, at several points during the program the judicial system was lambasted for its insensitivity to the rights of victims.

The inflammatory nature of pretrial publicity is not, however, the sole focus of a court in ruling on a motion for change of venue. A court's determination of prejudice must also take account of the pervasiveness of such publicity. *See Robinson*, 389 N.W.2d at 403; *Spargo*, 364 N.W.2d at 207. The State, in its motion resisting Nebinger's request for venue change, offered the results of a telephone survey of a sample of potential jurors. The survey was prepared by an independent research firm and was designed to gauge the influence of pretrial publicity on potential jurors. The survey was taken from April 25 to April 30, 1985. The sample for the survey consisted of three hundred Scott County residents who were eligible for jury duty. According to the survey, 161 of the sample of 300 indicated that they were familiar with the murder, the victim, or the defendants. Of these 161 persons, 45 indicated that they generally listen to the radio talk show program at issue here. This represents 28% of those familiar with the murder, victim, or defendants and 15% of the total sample. Of the 161 persons familiar with the murder, victim, or defendants, 37 indicated they had either listened to the program at issue here or had heard or read about the program. This amounts to 23% of those familiar with some aspect of the case and 12% of the total sample. Of those 37 who either heard or were familiar with the particular program at issue here, only 8 indicated they would not be able to set aside their personal opinion and serve impartially as a juror. This number represents 5% of those familiar with some aspect of the case and 3% of the total sample. Of the 161 persons familiar with some aspect of the case, 27 indicated they had formed an opinion as to the guilt or innocence of the defendants. This figure represents 27% of those famil-

iar with the case and 9% of the total sample.

Although jury voir dire was not recorded in the present case, the jury selection challenge sheet reveals that only three panel members were stricken for cause. "Cause" would include such prejudice as Nebinger complains of on this appeal. *See* Iowa R.Crim.P. 17(5)(k). Our courts have said that jury voir dire should be trusted to expose any substantial prejudice among potential jurors. *State v. Ware,* 338 N.W.2d 707, 713 (Iowa 1983). Our review of the community survey and pertinent voir dire papers persuades us that this case is substantially different from such cases as *State v. Robinson,* 389 N.W.2d 401 (Iowa 1986), in which our supreme court has found the type of error claimed here by Nebinger. In *Robinson,* the record evidence demonstrated that the relevant, sparsely-populated county had been "saturated" with publicity implicating the defendant; that nearly everyone on the jury panel was familiar with the case; and that ten of the first sixteen potential jurors questioned had already formed an opinion on the defendant's guilt or innocence. *Id.* at 403. Here, we think Nebinger has failed to show that prejudice was so pervasive as to deny him a fair trial. *See State v. Wilson,* 406 N.W.2d 442, 445–47 (Iowa 1987).

■ In addition to the survey and jury voir dire record which both suggest the absence of reversible prejudice, we note the passage of over three months between the February 18 airing of the program and Nebinger's May 29 trial date. Our courts have previously stated that similar time lapses were sufficient to dissipate any prejudicial effect that may have been created initially by adverse publicity. *Spargo,* 364 N.W.2d at 208 (two to three months); *State v. Cornelius,* 293 N.W.2d 267, 269 (Iowa 1980) (two months); *State v. Pelelo,* 247 N.W.2d 221, 223 (Iowa 1976) (three months). Also, our conclusion is not altered by the program's discussion of Nebinger's criminal record. It is well established that community knowledge of a defendant's prior criminal record does not

create a presumption of prejudice. *Spargo,* 364 N.W.2d at 208.

We find Nebinger's first contention to be without merit.

## II.

### (A)

Nebinger maintains the district court abused its discretion in excluding from evidence certain testimony concerning Lockheart's alleged prior conduct and acts. He contends the district court's abuse of discretion resulted in a violation of his right to present a defense as secured by the federal and state constitutions. The district court ruled the evidence at issue inadmissible both by pretrial order and by denying Nebinger's motion following the close of the State's evidence. Nebinger argues these rulings constitute error and that the proffered evidence is admissible to demonstrate Lockheart's ability and opportunity to commit the crimes alone and to identify Lockheart as the guilty party. Nebinger invokes Iowa Rule of Evidence 404 as an avenue paved for the admissibility of the several items of evidence.

Iowa Rule of Evidence 404 provides as follows:

(a) **Character evidence generally.** Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

 (1) *Character of accused.* Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

 (2) *Character of victim.*

 (A) **In criminal cases.** Subject to rule 412, Iowa Rules of Evidence, evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in any case where the victim is unavailable to testify due to death or physical or men-

tal incapacity to rebut evidence that the victim was the first aggressor;

**(B) In civil cases.** Evidence of character for violence of the victim of assaultive conduct offered on the issue of self defense by a party accused of the assaultive conduct, or evidence of peaceable character to rebut the same;

(3) *Character of witness.* Evidence of the character of a witness, as provided in rules 607, 608, and 609, Iowa Rules of Evidence.

**(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In applying rule 404, our primary task is to determine whether the challenged evidence is relevant and material to some legitimate issue other than a general propensity to commit wrongful acts. *State v. Barrett,* 401 N.W.2d 184, 187 (Iowa 1987). Subsection (b) of this rule exemplifies how the exclusionary ambit of subsection (a) applies to evidence of specific acts tending to show bad character. *Id.* The exclusionary force of rule 404(a) extends to instances in which the proponent offers the evidence for purposes other than establishing propensity based on character, but the court determines that in fact its only relevance is to illustrate the prohibited character propensity. *Id.*

With respect to rule 404(b), the general rule is that "one crime cannot be proved by proof of another." *State v. Cott,* 283 N.W.2d 324, 326 (Iowa 1979) (quoting *State v. Schlak,* 253 Iowa 113, 115, 111 N.W.2d 289, 291 (1961)). The purpose of the rule is to exclude from the jury's consideration evidence which has no relevancy except to show that the defendant is a bad person and thus likely committed the crime in question. *Id.* The exceptions to this rule are based upon the relevancy of certain evidence to the proof of some fact or ele-

ment in issue other than the defendant's criminal disposition. *Cott,* 283 N.W.2d at 326. The test of admissibility under an exception to rule 404(b) is two-pronged. First, the evidence must be relevant to one or more of the issues for which exceptions are recognized. *State v. Walsh,* 318 N.W.2d 184, 185 (Iowa 1982). Second, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *State v. Munz,* 355 N.W.2d 576, 579 (Iowa 1984).

■ Courts have not limited their application of these principles to defendants alone. Rather, courts have extended the 404(b) analysis to witnesses in general, *State v. Roth,* 403 N.W.2d 762, 765 (Iowa 1987), and to cases like that at bar in which a defendant wishes to introduce evidence of wrongdoing by another person in order to establish his or her own innocence. *United States v. Puckett,* 692 F.2d 663, 671 (10th Cir.), *cert. denied,* 459 U.S. 1091, 103 S.Ct. 579, 74 L.Ed.2d 939 (1983); *see People v. Hunt,* 133 Cal.App.3d 543, 546, 184 Cal. Rptr. 197, 203 (1982) (application of analogous state rule); *see also State v. Morano,* 697 F.2d 923, 926 (11th Cir.1983) (exceptions to rule 404(b) considered in general relevancy balance even though rule held to not apply directly). Evidence offered by a defendant tending to incriminate another must be confined, however, to substantive facts and create more than a mere suspicion that such other person committed the offense. *State v. Wilson,* 406 N.W.2d 442, 447 (Iowa 1987); *State v. Harrington,* 349 N.W.2d 758, 761 (Iowa 1984).

Nebinger challenges the district court's rulings with respect to the following six individual pieces of evidence: (1) evidence that during the winter of 1979–80 Lockheart had been diagnosed as a manic depressive and had been taking prescribed medication for mood control; (2) evidence that in November 1980 Lockheart and her older sister had forced their mother out of the family home; (3) testimony from a probation officer as to Lockheart's intense anger and violent outbreaks; (4) testimony from Lockheart's ex-boyfriend that in a fit of

anger Lockheart, when pregnant with their child, had began pounding on her stomach while stating that she hoped his baby died; that he thought Lockheart once had grabbed a knife and threatened to kill the baby; and that Lockheart had once slashed up his coat with a knife; (5) testimony from the mother of Lockheart's friend to the effect that Lockheart had once stabbed her mother in the hand with a fork; and (6) testimony from a second probation officer that Lockheart's general attitude could be summarized by use of the word "animal" and that he had once removed a stiletto lock blade knife from Lockheart.

**(B)**

█ We think the following challenged evidence was properly excluded by virtue of the general prohibition of character evidence contained in rule 404(a): evidence of the five-year-old manic depressive diagnosis and prescriptive treatment and testimony from either probation officer as to Lockheart's intense anger and "animalistic" attitude. Although Nebinger contends this evidence is relevant to a demonstration that Lockheart possessed the "ability and opportunity" to perpetrate the murder, we think it precisely the type of evidence which rule 404(a) was enacted to prohibit. We note that rule 404(a) does not contain an expansive list of exceptions to its general prohibition as does rule 404(b). Rather the language of rule 404(a), qualified only by three well-defined exceptions not applicable here, states that "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, . . . ." We see only one way in which this evidence proffered by Nebinger could be relevant to his desired inference that Lockheart had committed the crimes: by allowing the jury to infer that she acted in conformity with her animalistic, angry, and, at one time, manic-depressive character. *See Barrett,* 401 N.W.2d at 187; *see also State v. Ferguson,* 391 N.W.2d 172, 175 (N.D.1986). We are persuaded that the concerns with relevancy and prejudice which support rule 404(a), *see* Iowa R.Evid. 404 (federal advisory commit-

tee note), are directly applicable to this evidence. The district court did not err in excluding it.

**(C)**

█ We think the remainder of the proffered evidence is subject to analysis under rule 404(b). This includes the evidence that Lockheart once forced her mother from the family home; the evidence that Lockheart pounded on her stomach when pregnant in an alleged attempt to kill her unborn child, threatened to kill the baby with a knife, and slashed her former boyfriend's coat with a knife; evidence that Lockheart had stabbed her mother in the hand with a fork; and evidence that she had once carried a stiletto lock blade knife. We think each of these proffered pieces of evidence falls within the exclusionary ambit of rule 404(b) unless salvaged by its relevance to an exception to that rule. Nebinger maintains this evidence is relevant to show Lockheart's ability and opportunity to perpetrate the robbery and murder. He also claims the evidence would have tended to identify Lockheart as the guilty party.

█ In order for the evidence to be admissible under the identity exception to rule 404(b), Nebinger must demonstrate that the prior act or crime occurred under circumstances "strikingly similar" to those in the present case or that the two respective sets of circumstances are alike in their "unique nature." *State v. Walsh,* 318 N.W.2d 184, 186 (Iowa 1982). We think it plain that Nebinger has failed to make either showing. The only fact common to both the proffered evidence and the present crime is the use of a knife or other sharp object. We do not believe this fact makes the respective circumstances "strikingly similar"; nor do we think it marks the respective circumstances as sharing a "unique nature." If the use of a similar weapon were enough to pierce the protection afforded by rule 404(b), surely that rule would in practice provide no protection at all. *See Roth,* 403 N.W.2d at 765–66; *see generally State v. Richardson,* 400 N.W.2d 70 (Iowa App.1986) (application of identity exception to rule 404(b)). We think

the identity exception to rule 404(b) unavailable to Nebinger.

▮▮▮ Nebinger also claims the evidence is admissible as proof of Lockheart's ability and opportunity to commit the crimes. In order for Nebinger's proffered evidence to be admissible it must be relevant to a material issue which has been raised concerning one of the exceptions to rule 404(b). *United States v. Farber*, 630 F.2d 569, 571 (8th Cir.1980), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981). Stated differently, the proffered evidence must tend to establish some legitimate issue in the case. *Roth*, 403 N.W.2d at 765; *Barrett*, 401 N.W.2d at 187. We do not believe that Lockheart's opportunity to perpetrate the crimes was made an issue, let alone a material issue, at Nebinger's trial. The State does not deny that Lockheart was present at the victim's home; nor does the State contend that Lockheart's opportunity to commit the crimes was in any way restricted. The State's contention in Nebinger's trial was not that Lockheart lacked the opportunity to commit the crimes but, rather, that Nebinger seized that opportunity. *Compare Ferguson*, 391 N.W.2d at 175 (evidence of defendant's prior harassing phone calls relevant both to defendant's opportunity to commit present crime and to victim's opportunity to identify voice). Moreover, we fail to find the proffered evidence relevant to the issue of Lockheart's opportunity to commit these crimes even assuming, *arguendo*, that such an issue existed in Nebinger's trial. We think Nebinger's use of 404(b)'s opportunity exception is misguided.

▮▮▮ We deal next with Nebinger's contention that the evidence in question is relevant to demonstrate Lockheart's ability to perpetrate the crimes. We recognize that while "ability" is not expressly listed as an exception to rule 404(b), those exceptions which are listed do not purport to be exclusive. *Roth*, 403 N.W.2d at 765; *Barrett*, 401 N.W.2d at 187. To the extent that by "ability" Nebinger means essentially mental, psychological, or emotional ability, his argument flies directly in the face of rule 404(b)'s prohibition of propensity evidence and must fail. *See Barrett*, 401 N.W.2d at 187. To the extent that by "ability" Nebinger means physical capability, we think the evidence's relevance, if existent, is too tenuous to warrant admission. We think it essential that in order for evidence of Lockheart's past crimes or acts to be relevant to her physical ability to commit the current crimes, the similarity of the respective circumstances and acts must be manifest. When similarity is essential to establish the relevancy of the evidence with respect to the issue relied upon, the other acts must be reasonably similar to the crime charged. *See Roth*, 403 N.W.2d at 765. The present crime involved binding an older male so tightly with masking tape that circulation to his extremities was cut off and then inflicting numerous stab wounds upon the victim with a butcher knife. We do not think any of the proffered evidence is sufficiently similar to this crime so as to render the district court's exclusionary rulings an abuse of discretion. *See Roth*, 403 N.W.2d at 765–66. Neither do we find merit in Nebinger's claim that those rulings denied him a fair trial. *Id.*

### III.

Following the guilty verdict, Nebinger filed motions in arrest of judgment and for new trial. In each motion Nebinger claimed Renee Brown, a witness for the State, had made improper statements during a recess which had been overheard by the jury. These statements were allegedly to the effect that Nebinger had committed perjury and that his accusations toward Lockheart were false because "it would take more than one girl to tie" the victim, Brown's grandfather, up. The statements had allegedly been overheard by five of Nebinger's relatives, four of whom stated that the jurors were closer to Brown than were they. By implication, Nebinger argues the statements consequently must have been overheard by the jury. The State, in resisting Nebinger's posttrial motions, filed affidavits from eleven of the jurors stating that they had not overheard the comments. The district court denied Nebinger's motions primarily on that basis.

Nebinger claims that denial amounted to an abuse of discretion.

This factual situation arguably falls within two of the five categories of juror misconduct which were summarized in *State v. Sauls*, 391 N.W.2d 239, 241 n. 3 (Iowa 1986): improper communication or influence with jurors, and juror consideration of matters not in evidence. In order to impeach a verdict on the basis of juror misconduct, three conditions must be met: (1) evidence from the jurors must consist only of objective facts as to what actually occurred in or out of the jury room bearing on misconduct; (2) the acts or statements complained of must exceed tolerable bounds of jury deliberation; and (3) it must appear the misconduct was calculated to, and with reasonable probability did, influence the verdict. *State v. Cullen*, 357 N.W.2d 24, 27 (Iowa 1984). Nebinger shoulders the burden of demonstrating that these elements have been met. *See State v. Folck*, 325 N.W.2d 368, 372 (Iowa 1982). Our district courts possess broad discretion in ruling on motions which present such allegations. *Sauls*, 391 N.W.2d at 240. We do not find an abuse of discretion unless the trial court action was clearly unreasonable under the attendant circumstances. *Id.*

 Nebinger first challenges the validity of the affidavits submitted in support of the State's resistance. He contends, without citation of authority, that the affidavits are without effect because they each refer to the wrong date on which the allegedly improper statements were made and because the affidavits came from only eleven of the twelve jurors. We do not think the inclusion of the erroneous date renders the affidavit void. Although they referred to the incorrect date, they accurately referred to the point of trial at which Nebinger claims the statements were made: the recess between Nebinger's direct testimony and the State's cross-examination. The affidavits complied with statutory requirements, *see* Iowa Code § 622.85 (1987), and described the pertinent events with reasonable certainty, which is all that is required. 3 Am.Jur.2d *Affida-*

*vits* § 21 at 481–82 (1986). Nor do we think particularly important the fact that only eleven affidavits were presented. It is Nebinger's burden to show that the *Cullen* elements have been met. *See Folck*, 325 N.W.2d at 372. As applied to this case the required demonstration that the misconduct probably influenced the verdict, *Cullen*, 357 N.W.2d at 27, necessarily entails a showing that the jurors heard the statements. The State's failure to show that all twelve jurors did not hear the statements does not accrue to Nebinger's favor, as it is he who must show that the jury did hear it. Nor do we think the State's failure to produce the twelfth affidavit renders the remaining eleven void.

 We also reject Nebinger's claim that the affidavits are without effect because they contain statements as to what influenced the verdict. Although we recognize that such statements are to be ignored in our analysis of the present issue, *State v. Hahn*, 259 N.W.2d 753, 757 (Iowa 1977), the affidavits in the case at bar also contain statements from the jurors to the effect that they did not hear the comments allegedly made by Brown. We may consider such statements of objective fact. *See Folck*, 325 N.W.2d at 372; Iowa R.Evid. 606(b).

 While Nebinger maintains in brief that "[i]t is safe to say such misconduct probably did influence the verdict," we feel much less safe about such a conclusion. Nebinger has failed to show even that the statements were heard by the jury; much less has he shown to a reasonable probability that the statements influenced the jury's verdict. The district court did not abuse its discretion in denying Nebinger's claim for relief.

## IV.

Nebinger contends the district court abused its discretion in allowing into evidence a police officer's testimony which related certain test results from the department of criminal investigation. Sergeant Dennis Kern, lead evidence technician for the Davenport Police Department, was endorsed on the trial information as a State's

witness. The minute of testimony for Sergeant Kern discloses that he would testify about his investigation of the crime scene. His investigative report, which by reference thereto was made a part of his minute, notes that footwear impressions had been taken from tile inside the victim's bathroom. Nebinger was aware that these impressions were taken, that several pair of his shoes were seized, and that the impressions and the shoes were sent to the state criminal investigation laboratory for comparison testing.

Nebinger's trial began on May 29, 1985. Nebinger's counsel opted to give his opening statement at the commencement of the trial. His opening statement informed the jury that the State would not present any physical evidence placing Nebinger in the victim's home other than his presence at the back porch. The jury was also told that Nebinger would testify that he had not gone into the victim's home beyond the back porch. On the day that opening statements were given, and subsequent to the statements, the State filed and served a notice of additional testimony. The notice informed Nebinger that Sergeant Kern would testify to the results of the department of criminal investigation's comparison testing. Those tests showed that, although no positive matching of the footwear and impressions from the crime scene could be made, the impression taken from the victim's' bathroom was consistent in size, tread design, and wear with one of Nebinger's shoes. The prosecution had received the test results from the department of criminal investigation on May 29, the same date on which the notice of additional testimony was filed and Nebinger's trial commenced. Nebinger requested the district court to exclude the evidence as unduly prejudicial under Iowa Rule of Criminal Procedure 18(3). The district court ruled that the evidence could be used by the State only as rebuttal evidence if Nebinger took the stand and testified, consistent with his opening statement, that he had never been in the victim's home. In the face of this ruling, Nebinger's counsel agreed to allow the State to use the testimony in its case in chief. He now challenges the dis-

trict court's refusal to exclude the testimony.

Iowa Rule of Criminal Procedure 18(2) provides that a witness may testify in support of an information if the witness's identity and a minute of the witness's evidence has been given in accordance with the pertinent rules of criminal procedure. At the time Nebinger's information was filed, Iowa Rule of Criminal Procedure 5(3) required the prosecuting attorney to endorse upon the information "the names of the witnesses whose evidence the prosecuting attorney expects to introduce and use" and to file minutes of testimony for those witnesses including, *inter alia,* "a full and fair statement of the witness's expected testimony." Our rules of criminal procedure allow for the minutes of testimony to be amended before or during trial unless the substantial rights of a defendant are prejudiced. Iowa R.Crim.P. 5(5); 4(8)(e); 4(8)(a). In the present case, Sergeant Kern was endorsed as a witness on the information. His minute of testimony alerted Nebinger that Kern would testify to his investigation. This investigation included the taking of the footwear impression from the victim's bathroom. Nebinger concedes in brief that he "had notice of the potential footprint evidence upon receipt of the [original] minutes of evidence." Although he was not alerted to the precise nature of the test results, such a warning was not possible until after trial had begun as the results were not available to the county attorney's office until then. Rule 5(3) obligates the State to provide Nebinger only with a full and fair statement of Sergeant Kern's *expected* testimony. *See State v. Epps,* 313 N.W.2d 553, 557–58 (Iowa 1981). Pending favorable results of the department of criminal investigation's comparison analysis, the State cannot be held to have expected that Kern would testify to those results. As Nebinger's counsel conceded during his *in camera* request for exclusion, "we know that it was not within the control of the county attorney's office as to when these tests were performed, . . . ."

We think Nebinger's reliance on the ten-day notice provisions of rule 18(2)

and the district court's remedial powers under rule 18(3) is misplaced. Our reading of those rules and the cases which interpret them persuades us that the application of their ten-day provisions is limited to those situations in which the State attempts to use witnesses in addition to those endorsed on the information. *See State v. Smith,* 282 N.W.2d 138, 139–41 (Iowa 1979); *State v. King,* 225 N.W.2d 337, 342–43 (Iowa 1975). As the pertinent portion of rule 18(2) itself states

> *Additional witnesses* in support of the ... trial information may be presented by the prosecuting attorney if he or she has given the defendant's attorney of record, ... a minute of such witness' evidence, as defined in ... R.Crim.P. 5(3), at least ten days before the commencement of the trial. (emphasis added)

Similarly, rule 18(3) governs situations in which "the prosecuting attorney does not give *notice to the defendant of all prosecution witnesses* (except rebuttal witnesses) at least ten days before trial, ...." (emphasis added). We do not think that Sergeant Kern was an "additional witness" within the meaning of these rules. He was endorsed as a witness on the trial information, and Nebinger had received Kern's minute of testimony. We think that in these circumstances Nebinger's complaints are limited to claims that Sergeant Kern's testimony violated rule 5(3) either by exceeding the scope of the minutes, *see, e.g., State v. Caldwell,* 404 N.W.2d 186 (Iowa App.1987), or that the amendment of the minute resulted in prejudice to Nebinger within rules 5(5), 4(8)(e), and 4(8)(a). We do not think that Nebinger is entitled to the ten-day notice provisions of rules 18(2) and 18(3).

 We note that no discovery order was issued pursuant to rule 13(2)(b)(2) in this case. Such an order would have obligated the State "to permit [Nebinger] to inspect and copy or photograph any reports ... of scientific tests or experiments, ..." made by the State in connection with the case. Had such an order been issued, the State would have been obligated to supplement that disclosure as soon as additional evidence became available. Iowa

R.Crim.P. 13(5). Even were these rules applicable in the present case, however, the State would be obligated only to "promptly file written notice of the existence of the additional evidence...." *Id.* This they did.

 In the case at bar, Nebinger was aware that comparison tests were being undertaken between the footwear impressions and his footwear. He was aware that the test results were pending and he, perhaps more than anyone else, was of course aware that these results may be incriminating. In the face of his actual knowledge of this situation, he elected to give his opening statement before the State's presentation of evidence and therein declare that he had not been inside the victim's home and that the State would offer no evidence to the contrary. While the defendant possesses the right to give his or her opening statement at that stage in the trial, Iowa R.Crim.P. 18(1)(a)(3), we do not believe the defendant can claim prejudice when his or her unfortunate and articulated assumption that certain State's evidence will not materialize proves to be mistaken. We have said that the purpose of a defendant's opening statement is to afford the defendant an opportunity to state both the nature of his or her defense and the evidence he or she intends to offer in support of it. *State v. Miller,* 359 N.W.2d 508, 510 (Iowa App.1984). When Nebinger went beyond this and speculated on the nature of the State's evidence—evidence which the State was compiling in full compliance with the applicable rules of criminal procedure and good faith—he did so at his own risk.

We think Sergeant Kern's testimony was properly allowed and reject Nebinger's argument to the contrary.

### V.

#### (A)

 Nebinger claims he was denied effective assistance of counsel in several respects. Ordinarily, our appellate courts will not decide an ineffective assistance of

counsel claim on direct appeal, as we prefer to reserve such questions for postconviction proceedings where counsel can defend the charge. *State v. Taylor*, 310 N.W.2d 174, 179 (Iowa 1981). We depart from this preference, however, in cases where the record is adequate to evaluate an appellant's claim. *State v. Schoelerman*, 315 N.W.2d 67, 71 (Iowa 1982); *State v. Oglivie*, 310 N.W.2d 192, 195 (Iowa 1981). We think the record in the present case is sufficient for our review of Nebinger's appeal. We therefore proceed to the merits of his claim. Our review is de novo. *Taylor v. State*, 352 N.W.2d 683, 684 (Iowa 1984).

In order to succeed on a claim that he was denied effective assistance of counsel, Nebinger must show that his counsel failed to perform an essential duty and that prejudice resulted therefrom. *Snethen v. State*, 308 N.W.2d 11, 14 (Iowa 1981). Nebinger has the burden to prove both of these elements by a preponderance of the evidence. *Sallis v. Rhoades*, 325 N.W.2d 121, 122 (Iowa 1982).

In deciding whether trial counsel's performance was deficient, we require more than a showing that trial strategy backfired or that another attorney would have prepared and tried the case somewhat differently. *Fryer v. State*, 325 N.W.2d 400, 413–15 (Iowa 1982). Appellants must overcome a presumption that counsel is competent. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065–66, 80 L.Ed.2d 674, 693–94, *reh'g denied*, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). Appellants must show an affirmative factual basis demonstrating counsel's inadequacy of representation. *Snethen*, 308 N.W.2d at 14. The ultimate test is whether under the entire record and totality of the circumstances counsels' performances were within the range of normal competency. *Henderson v. Scurr*, 313 N.W.2d 522, 524 (Iowa 1981).

In order to prove prejudice, appellants must show that counsels' failure to perform an essential duty worked to their actual and substantial disadvantage. *State*

*v. Mills*, 344 N.W.2d 231, 234–35 (Iowa 1984). Specifically, appellants

> must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 694, 104 S.Ct. at 2069, 80 L.Ed. at 699; *Taylor*, 352 N.W.2d at 685.

In analyzing this claim, we note first that we need not determine whether counsels' performances were deficient before examining the prejudice component of an ineffectiveness claim. *Taylor*, 352 N.W.2d at 685 (Iowa 1984). We accept the counsel of the United States Supreme Court in this regard that

> [t]he object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

*Strickland*, 466 U.S. at 697, 104 S.Ct. at 2070, 80 L.Ed.2d at 700; *Taylor*, 352 N.W.2d at 685.

### (B)

Nebinger contends his trial counsel were ineffective in failing to prevent the jury from becoming aware of Lockheart's simultaneous trial. Nebinger claims that as a result of this knowledge his trial was, in effect, transformed into a joint trial with that of Lockheart. As a result, he claims, the jury naturally would become not only unfairly "disgruntled" with the inconsistent claims of himself and Lockheart, but also would be unfairly concerned with the possibility that Lockheart would be acquitted and that, as a result, no one would be held responsible for the crimes.

Nebinger concedes that "[t]he jury did not know Lockheart's defense exactly or

her description of Nebinger's acts." As a result of this concession, Nebinger's invocation of case law articulating our concern with antagonistic defenses in joint trials rings hollow. *See State v. Snodgrass,* 346 N.W.2d 472, 475–79 (Iowa 1984); *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir.1981). Nebinger claims that "the mere knowledge of the Lockheart simultaneous trial likely tainted the jury." Such speculation falls far short of the type of showing required by our ineffective assistance cases. He has not demonstrated the presence of counsel's duty to keep all knowledge of Lockheart's trial from the jury; the breach of that duty; or resulting prejudice. We therefore reject his contention.

### (C)

 Nebinger contends further proceedings are necessary in order to determine whether his counsel were ineffective in withdrawing their motion for exclusion of Sergeant Kern's testimony discussed in part IV *supra.* As discussed in that section, Nebinger's counsel decided, when faced with the district court's decision to allow Sergeant Kern's testimony on rebuttal, to allow the testimony to come in during the State's case in chief.

We disagree with Nebinger's contention that additional proceedings are needed in order to determine this claim. We held in part IV *supra* that Sergeant Kern's testimony was properly allowed. It follows from this holding that Nebinger can demonstrate neither counsels' breach of duty nor resulting prejudice. His claim is without merit.

### (D)

 Nebinger contends further proceedings are necessary in order to determine whether his counsel were ineffective in failing to determine the truth of certain statements used as a basis for cross-examination of Nebinger and in failing to advise Nebinger to avoid testifying concerning a prior arrest. We do not agree that further proceedings are necessary.

On cross-examination, Nebinger was questioned about a prior incident in which he had allegedly accepted money from the police in exchange for information concerning Lockheart's location. The State was attempting to impeach Nebinger's claim that he initially confessed to the murder in order to cover Lockheart's crime. The pertinent cross-examination testimony is as follows:

THE WITNESS: To the best of my knowledge, I cannot remember being paid $25 or $35 for leading that—I was promised at the time I was arrested over in Moline and at the time that they told me that if I cooperated with them, that they would not go and arrest Christine Lockheart. I filled out a pretrial release information which had Christine's name on it and address because I was living with her at the time. This officer came to me and told me if I would cooperate with him, that he would not go and arrest Christine Lockheart.

BY MR. HOFFMAN:

Q. Did he give you any money? A. No, he did not, to the best of my knowledge?

Nebinger now argues potential ineffectiveness of counsel due to counsels' failure to investigate the truth of the State's claimed offer of payment and counsels' failure to advise Nebinger against mentioning the prior arrest. We assume, for the purposes of this appeal, both that the State's assertion of the opportunity for payment is groundless and that counsel failed to discover this. In addition, we assume that counsel did not advise Nebinger against the aforementioned testimony. Finally, we assume that both failures amount to the breach of an attorney's essential duties. Even given these assumptions, we fail to see any reasonable probability that the absence of such errors would have resulted in a different verdict. *See Taylor,* 352 N.W.2d at 685. Nebinger's contention must fail.

### (E)

 Finally, Nebinger maintains additional proceedings are necessary in order to

194

determine whether a strategic decision motivated counsels' failure to request a hearing and obtain additional proof as to whether the twelfth juror overheard the statements, discussed in part III *supra,* which were allegedly made by Renee Brown. We think that Nebinger's counsel acted within the bounds of a defense counsel's essential duties, that no reasonable probability of a different outcome exists, and that no further proceedings are necessary.

The district court is affirmed. ·

AFFIRMED.

DONIELSON, P.J., concurs.

SACKETT, J., specially concurs.

SACKETT, Judge (specially concurring)

I agree with the affirmance of defendant's conviction. I would find the footprint evidence was admissible in the state's case in chief because the defendant's attorney agreed it was admissible. I do not agree with the majority's determination the evidence would be admissible in the state's case in chief irrespective of the defendant's agreement that it be admissible.

I would find the record insufficient to address defendant's claim of ineffective assistance.

I would affirm the defendant's conviction.