[Crim. No. 14331. Fourth Dist., Div. Two. June 13, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD ANGEL CHAGOLLA et al., Defendants and Appellants.

[Crim. No. 14361. Fourth Dist., Div. Two. June 13, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD ANGEL CHAGOLLA, Defendant and Appellant.

424

## Counsel

Terry E. Bunfill, John R. Fisher and Gary H. Blaylock, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, A. Wells Petersen and Steven H. Zeigen, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**THE COURT.\***—Defendants Ronald Chagolla, Edward Chagolla, and Timothy Arevalo were convicted by jury verdict of assault with a deadly

---

*Before Kaufman, Acting P. J., McDaniel, J., and Rickles, J.

weapon (Pen. Code, § 245), discharging a firearm at a dwelling (Pen. Code, § 246), and exhibiting a firearm in a threatening manner (Pen. Code, § 417). The jury found that Edward Chagolla personally used a firearm to commit the assault (Pen. Code, § 12022.5) and that Edward Chagolla intentionally inflicted great bodily injury on the victim of the assault (Pen. Code, § 12022.7). Edward Chagolla was sentenced to state prison for a term of six years, Ronald Chagolla was sentenced to state prison for a term of three years, and Timothy Arevalo was sentenced to the Youth Authority for a maximum term of three years. As a result of his conviction, Ronald Chagolla's probation was revoked and he was sentenced to state prison on a previous burglary conviction. The three defendants have each appealed from the judgments against them. Ronald Chagolla has also appealed from the order revoking his probation.

Each defendant contends that the trial court committed reversible error by holding unreported oral communications with the jury during its deliberations without notice to counsel. Ronald Chagolla contends that his convictions are not supported by sufficient evidence. Edward Chagolla contends that the great bodily injury finding is not supported by sufficient evidence and that the trial court lacked authority, after Edward's notice of appeal was filed, to correct an error in the pronouncement of his sentence.

## FACTS

Timothy Arevalo was driving his yellow 1962 Chevrolet in the Highgrove area on the afternoon of July 27, 1981. Ronald Chagolla was riding in the front passenger seat, his brother Edward was in the rear seat directly behind him, and Richard Reyes was in the back seat on the driver's side.

At 3:30 Priscilla Ramirez was standing in the front yard of her house in the 800 block of Orange Street when she saw the car pass. She recognized Arevalo and Ronald Chagolla. She heard Ronald yell: "Northside." She saw the car again at 4 and at 5:25.

Anthony Estrada was standing in the front yard of a house on the same block between 5 and 6 p.m. He saw the yellow Chevrolet three times in a ten-minute interval. He also recognized Timothy Arevalo and Ronald Chagolla.

The car was seen by three witnesses who lived in the next block south on Orange Street. One of these witnesses, Patrick Pugh, saw the Chevrolet pass his house three times between 5:30 and 5:45. On the third occasion, he saw Edward Chagolla holding a rifle with the barrel protruding from the side window of the car. When Pugh went outside to investigate, Edward

Chagolla swung the rifle barrel until it was pointed directly at Pugh, who took cover and waited for the vehicle to leave.

At about 5:45, the yellow Chevrolet rolled slowly past the house of Charles Contreras at 856 Orange Street. Two witnesses in a car behind it saw Edward Chagolla lean out the side window up to his waist and fire the rifle about 12 times. Roughly half of the bullets struck an insurance agent's car parked in the driveway in front of the Contreras house. The other bullets hit the house. Diana Murillo, age 13 and niece of Charles Contreras, was inside the house standing behind the front door. She opened a small window in the door to see what was happening. A bullet struck her in the right cheek, fragmenting against the mandible or jawbone. Fragments lodged in the neck and in the mastoid bone behind the right ear. The fragments were not removed because the risks of removal outweighed the benefits. Apparently her recovery was satisfactory at the time of trial, three months later, but it was too soon to determine whether there was permanent damage to facial nerves or to the mandible joint.

Police and sheriff's officers were investigating the scene of the shooting at 6:55 when the yellow Chevrolet again passed the Contreras residence. It was pursued and stopped. All the occupants were arrested. Blood samples drawn at 9:30 revealed content of 0.22 percent for Ronald Chagolla, 0.21 percent for Timothy Arevalo, and 0.19 percent for Edward Chagolla.

## I

We turn first to Ronald and Edward's claim of insufficiency of the evidence. ■ " 'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. [Citation omitted.] The appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' . . . [citations omitted]. Evidence, to be 'substantial' must be 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.' [Citations omitted.] [¶] In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' (*People* v. *Mosher* (1969) 1 Cal.3d 379, 395 . . . [citation omitted].)" (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].)

■ "Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact. [Citations omitted.] Consequently,

' "all intendments are in favor of the judgment and a verdict will not be set aside unless the record clearly shows that upon no hypothesis whatsoever is there sufficient substantial evidence to support it." ' (*People* v. *Moore* (1953) 120 Cal.App.2d 303, 306 [260 P.2d 1011].)" (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094 [126 Cal.Rptr. 898].)

■ In order to hold Ronald as an aider and abettor it must be determined whether he, in any way, directly or indirectly, aided the perpetrator, with knowledge of the latter's wrongful purpose. "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense. (*People* v. *Hawkins* (1968) 268 Cal.App.2d 99, 104 [73 Cal.Rptr. 748]; *People* v. *Perryman* (1967) 250 Cal.App.2d 813, 820 [58 Cal.Rptr. 921]; [citations omitted].) In addition, flight is one of the factors relevant in determining consciousness of guilt. [Citation omitted.]" (*In re Lynette G., supra,* 54 Cal.App.3d 1087, 1094-1095.)

■ We examine Ronald's conduct and other evidence in light of these factors. The vehicle Ronald was in continuously cruised the area where the shooting occurred for over two hours. Ronald's brother, Edward, was in the vehicle occupied by Ronald and armed with a rifle. Ronald leaned out of the window and yelled, "Northside" during one of the passes by the site of the shooting before the shooting. Ronald's brother pointed the rifle at another person south of the shooting site before the shooting. Shortly after pointing the rifle at the person south of the shooting site, Edward used the rifle to do the shooting from the seat directly behind Ronald. Edward fired the rifle approximately 12 times. The vehicle containing Ronald and Edward left the scene immediately after the shooting. Approximately one hour later, the same vehicle containing Edward, Ronald and the others drove past the scene of the shooting. The vehicle was pursued, stopped and all occupants, including Ronald and Edward, were arrested. Evidence indicated all the arrestees had been drinking. It would be farcical for Ronald to contend he was in an automobile with his brother and others for over two hours cruising the area with his brother pointing a gun at others and be oblivious of what was going on. Ronald's conduct and other circumstances indicating his participation belie this contention. The automobile being a Chevrolet, Ronald would have to have been the General Motors' test dummy to avoid gathering knowledge as to the events about to occur. The fact Ronald had over an hour to disassociate himself from his evil companions who were out to do mischief could also be considered by the jury. The jury could reasonably deduce from direct and circumstantial evidence that Ronald knew Edward was armed with a rifle, knew Edward intended to do the shooting and both directly and indirectly rendered support and encouragement to his brother Edward in the commission of the offense.

■ Edward Chagolla maintains that the great bodily injury finding is not supported by the evidence because he could not have intended to injure someone inside the house who could not be seen from the street. The uncontradicted evidence, however, was that the victim was hit after she opened a small window in the door and that three or four bullets lodged in the door. The jury could reasonably infer that Edward Chagolla directed his fire at the door after seeing the small window open and that his intention was to inflict great bodily injury on whoever had opened the window. Accordingly, the finding is supported by the evidence.

## II

The jury began deliberating at 3:30 on November 3. On the following day, while the jury continued its deliberations, the trial judge made the following statement to counsel:

"Let the record show that last night shortly after the jury retired for deliberation they asked as follows by note which they sent: 'Instructions on aiding and abetting, great bodily injury and intent. Books on section 246, 247, 245, 240, and 417.' Well, I was a little concerned about the word 'books.' Since they'd asked to be allowed to go home—it was a hard session. There were the instructions and not much time left, anyway—I was afraid they wanted to read some books; and, of course, the Penal Code's available in the law library. As a matter of fact, public library, probably.

"So, I went up and asked them if that's what they wanted. They said: 'No.' What they wanted was the instructions, and I think they had in mind that I'd referred to the books of CALJIC instructions, and so forth. And I told them that I didn't want them to do their own research, and that it would be improper for them to go and read these sections. And so they quite readily agreed all they were interested in was the instructions. They had different interpretations or different recollections of what I'd said.

"So, I agreed to do all the instructions they requested, not all of them as Mr. Starr [a juror] had suggested earlier while we were giving instructions, but just the ones they requested. So, I gave them 25 through 45 this morning in writing, and that's beginning with three hundred—CALJIC 3.00 on principals and running through the instructions on enhancements and—but not including the 17.00 series.

"I also read to them the following instruction which applies when you give them written instruction. Now, this morning when I went to do that, the court reporter was in the law library down the street, and in order to get it to them in time to be beneficial and since it was so routine, I did it

without a reporter; and I'm putting it on the record now. This is what I read: 'The written instructions now being given will be made available in the jury room during your deliberations. They must not be defaced in any way. You will find that the instructions may be either printed, typewritten, or handwritten. Some of the printed or typewritten instructions may be modified by typing or handwriting. Blanks in the printed instructions may be filled in by typing or handwriting. Also, portions of printed or typewritten instructions may have been deleted by lining out. You are not to be concerned with the reasons for any modifications that have been made. Also, you must disregard any deleted part of an instruction and not speculate either what it was or what is the reason for its deletion. Every part of an instruction, whether it is printed, typed, or handwritten is of equal importance. You are to be governed only by the instruction in its final wording, whether printed, typed, or handwritten.'

"Then I gave them a copy of that instruction along with the others. Before giving them the instructions in written form, I removed all captions and all indications of the origin of the request and all the use notes and everything, just the bare instructions; and where necessary, actually retyped them, although some of them are marked up in the usual manner where they are still legible.

"All right. Then, just as I was leaving, they mentioned something about 12022.5, would they have that; and that's a very logical question, because when you stop and think of it they're asking—they're asked in the verdict to make a finding within the meaning of 12022.5. How can they find it's within that meaning if they don't have it in front of them? And, of course, if they'd make the finding up to that phrase, of course, it is within the meaning of 12022.5.

"And so we have never worried about that, but maybe the District Attorney might reconsider his verdict forms. I don't know. I said, well, obviously it has some significance because you're being asked to make a finding: Was it with a gun or was the crime committed or did the defendants use a rifle in the commission of the crime or not?

"But I said: I don't want you to read the section even if you could find it because, of course, the punishment is not up to you. What we do about this finding is not your concern at all. You're just simply to find at all that the gun was used and/or it was not, and the same with great bodily injury, intentionally inflicted. I was careful every time to include the intent element.

"Just as I was walking out of the door, one of the jurors piped up and said: 'Well, are we supposed to find that he intentionally injured this particular girl, Diana Murillo, as opposed to someone else?'

"And, of course, that's the area that we'd been talking about before, and so I said: 'Well, that goes beyond anything I've instructed you on, in so many words. I'll consult with counsel and come back to you.'

"That's what we're here for now."

The juror's question about the great bodily injury instruction was discussed by the court and counsel for some time. A suggestion to tell the jurors that the answer to the question would be found in the instructions already given proved agreeable to all. The jury was brought into the courtroom and their question was answered as agreed. The jury resumed deliberations and reached verdicts on the following day.

All defendants moved for a new trial on the ground that the trial court had erred in holding unreported oral communications with the jury during its deliberations. The court acknowledged it had erred but denied the motion because prejudice had not been shown.

█ Penal Code section 1138 requires that any questions posed by the jury regarding the law or the evidence be answered in open court in the presence of the accused and his or her counsel, unless presence is waived. Communication between judge and jury during deliberations without affording defendant and counsel an opportunity to be present impinges on a defendant's constitutional right to the assistance of counsel. (*People* v. *Knighten* (1980) 105 Cal.App.3d 128, 132 [164 Cal.Rptr. 96]; *People* v. *Dagnino* (1978) 80 Cal.App.3d 981, 986 [146 Cal.Rptr. 129].) The error does not require reversal unless prejudice appears. (*People* v. *Woods* (1950) 35 Cal.2d 504, 512 [218 P.2d 981]; *People* v. *Alcalde* (1944) 24 Cal.2d 177, 188-189 [148 P.2d 627].) Reversal is not required if the court is satisfied beyond a reasonable doubt that the error did not contribute to the verdicts. (*People* v. *Vinson* (1981) 121 Cal.App.3d 80, 85 [175 Cal.Rptr. 123].)

The task of determining prejudice is particularly difficult where, as here, the communications are oral and unreported and the record consists of the judge's recollection of the communication. (See *People* v. *Dagnino, supra,* 80 Cal.App.3d 981, 988; *People* v. *Jenkins* (1963) 223 Cal.App.2d 537, 540 [35 Cal.Rptr. 776].) There is also authority, however, that an error of this kind is waived if it could have been but was not raised before verdict by objection or motion for mistrial. (*People* v. *Kageler* (1973) 32 Cal.App.3d 738, 746 [108 Cal.Rptr. 235]; *People* v. *Morales* (1943) 60 Cal.App.2d 196, 200 [140 P.2d 461]. See also, *People* v. *Litteral* (1978) 79 Cal.App.3d 790, 796 [145 Cal.Rptr. 186].) The waiver rule which is applied to prosecutorial misconduct is equally appropriate here. Under that rule, the failure to object or to move for mistrial is deemed a waiver unless

the prejudice could not have been cured by a timely objection and admonition. (See *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].)

■ The trial judge informed defense counsel of the communications while the jury was deliberating and long before the verdicts were returned. If there was anything improper in the substance of the communications, as related by the judge from memory, counsel could have requested that the error be corrected by further instructions to the jury. If counsel entertained any doubts about the accuracy or completeness of the judge's recollection, the jurors could have been summoned and questioned regarding their recollection of the communications. If counsel wished to inspect the written instructions, this could have been arranged. Counsel did not object or request that any of these obvious steps be taken. Accordingly, failure to object constituted a waiver unless the substance of the communications was so prejudicial that it could not have been cured by further instructions.

We find nothing in the substance of the communications which satisfies this test of prejudice. The admonition not to consult the Penal Code was entirely correct, the written instructions were those already given, and the instruction regarding written instructions was correct. The question about the great bodily injury allegation was answered after consultation with counsel. There was nothing improper in the statement about the firearm use allegation and, in any event, the evidence to support that finding was overwhelming. No prejudice appears and the error was harmless beyond a reasonable doubt.

### III

The information alleged that Edward Chagolla inflicted great bodily injury on Diana Murillo in the commission of an assault with a deadly weapon. There was no great bodily injury allegation attached to the count charging firing at a dwelling. The jury verdicts were in accordance with the charges in the information but when defendant Edward Chagolla was first sentenced, on December 3, the court attached the enhancement for great bodily injury to the sentence for firing at a dwelling, which was made the principal term, rather than to the sentence for aggravated assault. Defendant Edward Chagolla filed a notice of appeal on the same day. The error having been brought to the court's attention, Edward Chagolla was resentenced on December 8. The sentence for the aggravated assault became the principal term once the great bodily injury enhancement was included in that term.[1]

---

[1]The principal term is "the greatest term of imprisonment imposed by the court for any of the crimes. . . ." (Pen. Code, § 1170.1, subd. (a).) Except where it chooses among terms of equal length, therefore, the court has no discretion in selecting the principal term.

■ Defendant Edward Chagolla contends that the error in the original sentence was judicial error and could not be corrected by the trial court. Moreover, he maintains, the court lost jurisdiction to correct errors after the notice of appeal was filed. According to defendant, the enhancement for great bodily injury cannot be imposed because it was not properly imposed at the original sentencing.

The distinction between clerical and judicial error is significant only in cases where the judgment originally pronounced was a valid judgment under the Penal Code. ■ A sentence not authorized by law is subject to correction whenever the error comes to the attention of the trial court or a reviewing court. (*People* v. *Serrato* (1973) 9 Cal.3d 753, 763 [109 Cal.Rptr. 65, 512 P.2d 289]; *People* v. *Hunt* (1982) 133 Cal.App.3d 543, 564 [184 Cal.Rptr. 197]; *People* v. *Grimble* (1981) 116 Cal.App.3d 678, 685 [172 Cal.Rptr. 362].) In such a case, the sentence, or at least its unlawful part, is void. (*In re Sandel* (1966) 64 Cal.2d 412, 417-419 [50 Cal.Rptr. 462, 412 P.2d 806]; *Wilson* v. *Superior Court* (1980) 108 Cal.App.3d 816, 818 [166 Cal.Rptr. 795].) A void judgment may be vacated by the trial court despite the pendency of an appeal. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 7, pp. 4024-4025.)

■ Defendant Edward Chagolla's sentence was unauthorized because the great bodily injury enhancement was applied to the wrong count. Accordingly, the sentence was void, at least in part, and could be corrected despite the pendency of the appeal.

Relying on *In re Candelario* (1970) 3 Cal.3d 702, 705 [91 Cal.Rptr. 497, 477 P.2d 729], defendant Edward Chagolla argues that the trial court's failure to apply the great bodily injury enhancement to the proper count at the first sentencing must be construed as an implied dismissal of the great bodily injury finding.

*Candelario* is distinguishable on its facts because in the present case, unlike *Candelario,* the record of the first sentencing affirmatively shows the trial court's intention to impose the enhancement. Moreover, the *Candelario* rationale that silence operates as an implied dismissal does not apply to enhancement findings which cannot be dismissed without an adequate statement of reasons. (*People* v. *Hunt* (1977) 19 Cal.3d 888, 897 [140 Cal.Rptr. 651, 568 P.2d 376]; *People* v. *Williams* (1980) 103 Cal.App.3d 507, 519 [163 Cal.Rptr. 169]; *People* v. *Allen* (1978) 76 Cal.App.3d 748, 752 [143 Cal.Rptr. 164].) Here the record contains no reasons for dismissing the great bodily injury finding, which is hardly surprising since, as already stated, it is plain from the record that the trial court intended to impose it.

Under the cited authorities, there was no dismissal of the enhancement finding and the trial court properly imposed it at the second sentencing.

The judgments are affirmed.

Appellants' petitions for a hearing by the Supreme Court were denied August 10, 1983.