Filed 12/1/22  P. v. Pereira CA4/2
See Dissenting Opinion

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077293 |
| v. | (Super.Ct.No. FWV21000792) |
| ARNOLD STEVEN PEREIRA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Jon D. Ferguson, Judge.  Affirmed.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Alana R. Butler and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Arnold Steven Pereira guilty of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1), count 1) and vandalism (§ 594, subd. (b)(1), count 2).  A trial court sentenced him to two years in state prison.

On appeal, defendant contends that the court engaged in ex parte communications with the jury, in violation of his constitutional rights to be present, to be represented by counsel at a critical stage, and to due process.  He claims the judgment must be reversed. We affirm.

## FACTUAL BACKGROUND

Defendant lived with his parents.  His sister, A.P., her husband, and her son, W.P., moved in with them on February 1, 2021.  Two of W.P.'s friends assisted with the move. At one point during the move, W.P. was sitting in the living room, and his friends were moving a couch into the house.  Defendant approached W.P. and A.P. and said, "Oh, you guys are fancy" since they had movers helping them.  W.P. looked at his mother, who said to just ignore defendant.  Defendant told W.P. he was a "bitch" and then ran to the kitchen and grabbed two knives.  W.P. ran outside, and A.P. followed him.  Defendant chased after W.P., and W.P. tripped over a piece of furniture.  A.P. testified that defendant tried to stab W.P. by swinging one of the knives at him.  When first asked how close defendant was when he swiped the knife at W.P., A.P. said she did not remember

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

because it happened so quickly. Upon further questioning, she said defendant was about two feet away. W.P. left in A.P.'s husband's car.

A.P. and her husband went across the street and called 911. While she was on the phone, defendant was yelling and began kicking his father's car. After that, he began stabbing the rear passenger's side of the car, and the blade of one knife broke off. The police responded to the scene and interviewed A.P. At trial, A.P. testified that she did not remember much about the day of the incident, except that defendant had knives in his hands, chased W.P., and kicked and stabbed the car.

The police officer who responded to the scene testified at trial. He found two knives in defendant's room, underneath the bed. One of the knives had a broken blade. The officer interviewed A.P. on the day of the incident, and a recording of a portion of the interview was played for the jury. A.P. told the officer that defendant got the knives and said he was going to kill her son; W.P. tripped over a TV stand and fell, and defendant held a knife above his head and swung it at him; A.P. got in front of W.P. and said, "Kill me before you touch my son." She then told W.P. to leave and take her car.

W.P. also testified at trial. He said that about five months prior to his family moving, defendant got into an argument with W.P.'s girlfriend. Then, defendant attacked W.P., and they got into a physical fight. W.P. also testified that on the day of the move, he was in the living room having a conversation with his mother and his two friends about where they were going to place the furniture, and defendant went in the kitchen and grabbed two knives. W.P. said defendant ran after him and tried to kill him. W.P. ran outside and defendant chased him. W.P. said he tripped over a dresser but got up and

3

kept running. He said defendant swung a knife at him when he was approximately seven to eight feet away and threatened to kill him. W.P. said defendant tried to swipe the knife at him again, but A.P. got in front of him. W.P. said defendant spit on A.P. and threatened to kill her too. W.P. drove off in A.P.'s husband's car.[2]

## DISCUSSION

### Any Error Was Harmless

Defendant asserts that the court engaged in ex parte communications with the jury when the jury indicated it was deadlocked on one count, and the court asked it to put the declaration of deadlock in writing, asked if it still wanted a readback of testimonies it had previously requested, and gave the jurors CALCRIM No. 3551, which encouraged them to continue deliberations. Defendant contends the court thereby deprived him of his federal and state constitutional rights to the assistance of counsel at all critical stages of the proceedings, due process, and "derivatively" of his right to be present. He claims the error is reversible per se, or at the very least, not harmless beyond a reasonable doubt. We conclude that any error was harmless beyond a reasonable doubt.

A. *Procedural Background*

During closing arguments, as to the assault with a deadly weapon charge (count 1), the prosecutor argued that W.P. started running away when he saw defendant go into the kitchen; W.P. tripped over a piece of furniture on the front lawn, and when he was getting up, defendant swung one of the knives at him. The prosecutor argued, "That's the

---

[2] At trial, W.P. referred to A.P.'s husband as her boyfriend.

4

application of force right there. That's the event that is the assault with a deadly weapon. When the defendant got close enough to the victim, [W.P.], he took the knife and swiped at him." Defense counsel reminded the jurors that A.P. could not clearly recall the details of the incident at trial. He also pointed out the discrepancies between A.P.'s and W.P.'s testimonies, in that A.P. testified defendant swiped the knife when he was about two feet away from W.P., whereas W.P. testified defendant was about seven to eight feet away. Defense counsel argued there was no way the knife would make contact with W.P. from a distance of seven to eight feet.

In her rebuttal, the prosecutor replied: "[T]his case is an assault. It is not a battery. If this case was a battery, then I would have to prove beyond a reasonable doubt that the defendant touched someone in a harmful or offensive way. That's not the charge. [¶] The charge is that the defendant assaulted someone with the state of mind that he intended to hurt that person. I do not have to show that the defendant was within a certain range. I have to show that the defendant had the present ability to harm his nephew."

After the jury retired to deliberate, the court advised defendant that if there were any jury questions or requests during deliberations, it would normally notify counsel of its proposed response; the court added, "We don't reconvene." However, if the jury indicated they could not reach a verdict or there was an issue that required a "protracted hearing," defense counsel would make arrangements for defendant to be present. The court then asked defendant, "Are you okay if we handle those questions outside your presence, leaving it to [defense counsel] to decide, I think I would like [defendant] here

5

for this? Are you okay if we handle the more routine things and leave it to your attorney to decide when he wants you present?" Defendant agreed to that procedure.

The jury started deliberating at 11:10 a.m. and recessed from 11:55 a.m. to 1:38 p.m. At 3:00 p.m., the jury indicated it had reached a verdict.[3] At 3:15 p.m., the jury submitted two requests, asking for a readback of A.P.'s and W.P.'s testimonies regarding defendant "slashing the knife" and asking if defendant was arrested on the day of the incident. The jury recessed for the evening at 4:25 p.m.

The following morning, the court made a record of the proceedings in the presence of defendant, his counsel, and the prosecutor. The court stated that the day before, it received a note from the jurors saying they wanted a readback of the testimonies of A.P. and W.P. and wanted to know if defendant was arrested. The court and counsel "conferenced that issue." The court reporter then started preparing her notes from the requested testimonies. The court recounted: "By the time we could get the information on those two questions to the jury, I believe they telephoned the bailiff saying they were deadlocked, or they had a verdict that they were deadlocked. [¶] At that point, we indicated that they needed to put it in writing. And in the meantime, since we [had] not provided the read-back or answer to Number 2, I sent a written note to the jury, with the two questions, number one, 'Do you still need the testimony read to you from your earlier question'; number two, 'Do you still need an answer to your second question?' They responded, 'No.' . . . [¶] Shortly after that, we received a written note, as I recall, saying,

---

[3] At that point, the jury apparently reached a verdict on the vandalism charge only.

'We are deadlocked on charge 1-A. We don't think more time will help.' And what I did without any further discussion, I sent back . . . CALCRIM 3551 which talks about things to think about during jury selection [*sic*]. . . . And then shortly after that, they left for the day."[4] The court stated that the next morning the jury deliberated for about 20 to 25 minutes, then had a verdict.

The court added, "I don't know if either side would have objected to 3551. I thought time was of the essence. And quite honestly, they had not been deliberating a particularly long time. I think that 3551 was appropriate, whether there was an objection from either side, or not. I will own that, that I felt it was appropriate to send it back, and I did so." The court asked if everyone was ready to have the jury come in, and both parties said yes. The jury returned to the courtroom and informed the court it had reached verdicts on both counts, and the verdicts were read in open court.

---

[4] CALCRIM No. 3551 provides: "Sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict. Please consider the following suggestions. [¶] Do not hesitate to reexamine your own views. Fair and effective jury deliberations require a frank and forthright exchange of views. [¶] Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict. Both the People and the Defendant are entitled to the individual judgment of each juror. [¶] It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to get a fresh perspective. [¶] Let me know whether I can do anything to help you further, such as give additional instructions or clarify instructions I have already given you. [¶] Please continue your deliberations at this time. If you wish to communicate with me further, please do so in writing using the form my bailiff has given you."

7

B.  *Defendant Forfeited His Claims*

" 'It has long been the rule that the trial court should not entertain communications from the jury except in open court, with prior notification to counsel.' [Citation.] ' "This rule is based on the precept that a defendant should be afforded an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection or suggest a different reply more favorable to the defendant's case." ' " (*People v. Jennings* (1991) 53 Cal.3d 334, 384 (*Jennings*).)  Section 1138 "requires that any questions posed by the jury regarding the law or the evidence be answered in open court in the presence of the accused and his or her counsel, unless presence is waived." (*People v. Chagolla* (1983) 144 Cal.App.3d 422, 432 (*Chagolla*); see § 1138.)  "In essence, the rule barring confidential communications between the court and jury protects a defendant's fundamental constitutional right to the assistance of counsel at all critical stages of the proceeding." (*People v. Garcia* (1984) 160 Cal.App.3d 82, 88.)

Assuming the subject communication with the jury occurred at a critical stage of the proceedings, defendant forfeited his claim that his rights to be present and to assistance of counsel were violated.  (See *People v. Dagnino* (1978) 80 Cal.App.3d 981, 988 (*Dagnino*).)  We first note the court's recollection concerning when it received the note from the jurors requesting readback of the testimonies.  The court stated: "*We conferenced that issue, the Court and Counsel.*" (Emphasis added.)  This statement shows that the court discussed the jury's request with both parties.  In other words, defense counsel knew about the jury's communication with the court concerning the readback of the testimonies.  We also note that defendant earlier agreed to have the court

8

and counsel handle jury questions or requests, and to leave it to his attorney to decide when he wanted defendant present.

Furthermore, the court made a record of all of its communications with the jury the day after they occurred, in the presence of the parties, including defendant himself. After stating what had occurred, the court inquired, "Either side have anything to add about the history of the jury deliberations?" Both counsel said no. This exchange indicates that both sides knew "the history" of the communications with the jury. Thus, the record illustrates that defense counsel was present for, and/or aware of, the subject communications with the jury prior to the jury returning to the courtroom and taking the verdicts. (See *supra,* § C.)

Moreover, although the court did have ex parte communication with the jury, defendant did not object, request that any error be corrected by further instructions to the jury, or move for a mistrial or a new trial when the court put "the history" on the record. (See *Chagolla*, *supra*, 144 Cal.App.3d at p. 433.) By failing to object to the ex parte communication with the jury, defendant forfeited the claims of error he now raises. (*Jennings*, *supra*, 53 Cal.3d at p. 383.)

Defendant argues he did not forfeit his claims because the court did not disclose the ex parte communication until after the verdicts were reached and because the court indicated that any objection to instructing the jury with CALCRIM No. 3551 would have been futile. However, the fact that the jury informed the court it had reached a verdict did not preclude defendant from raising his objections. The verdict had not been read in court yet; thus, defendant could have asserted the claims he now raises, and the court

9

could have granted a mistrial.  (See *Chagolla*, *supra*, 144 Cal.App.3d at p. 432 ["an error of this kind is waived if it could have been but was not raised before verdict by objection or motion for mistrial"].)  Furthermore, although the court did remark it thought it was appropriate to give CALCRIM No. 3551 and encourage the jury to continue deliberating since the jury had not been deliberating long, the court did not indicate how it would have ruled on the constitutional objections defendant now raises.[5]

    C.  *The Court's Error Was Harmless Beyond a Reasonable Doubt*

Even if we reach the merits of defendant's claim, no relief is warranted.  As to the first part of the communication at issue, the court did not direct the jury on any question "regarding the law or the evidence."  (*Chagolla*, *supra*, 144 Cal.App.3d at p. 432; see *People v. Hawthorne* (1992) 4 Cal.4th 43, 69 (*Hawthorne*).)  The record reflects that the jury requested readback of specific testimony and asked if defendant was arrested.  As discussed *ante*, the court and counsel conferred and apparently agreed to the readback of the testimonies.  As the court reporter was preparing her notes on the requested testimonies, the jurors telephoned the bailiff to say they were deadlocked.  In other words, the readback was not done before the jurors contacted the court again to say they were deadlocked.  The court responded and merely told the jurors to put the statement that they were deadlocked in writing.  Then, because the readback had not been done yet, the court sent a written note to the jurors asking if they still needed the testimonies read

---

[5]  In his reply brief, defendant claims that by its comment concerning CALCRIM No. 3551, the court "implicitly communicated that [it] would overrule any after-the-fact objections to the concomitant deprivation of rights to counsel and presence."  However, we see nothing in the record to support this claim.

10

to them and an answer to their question of whether defendant was arrested. The record reflects the jurors wrote "no" next to each question, and sent the note back. Although the record indicates the court and counsel discussed the readback of the testimonies, it does not appear that the court conferred with defense counsel about having the jurors put their statement of being deadlocked in writing or about sending the note to ask if they still needed the readback or the answer to their question. In any event, the portion of the communication regarding the jurors' deadlock and if they still needed the readback and answer to their question was "an essentially ministerial exchange," and we see nothing that could have affected the verdict. (*Hawthorne*, *supra*, 4 Cal.4th at p. 68.)

Defendant claims that when the court asked the jury whether it still wanted the requested readback, the court "implicitly suggest[ed] readback was unnecessary." He argues the court's inquiry was not harmless since "the jury was split and readback could have cemented their reasonable doubt on the assault charge." In his reply brief, defendant goes further, claiming the court actually "elicited from the jury that crucial readback was no longer needed." However, the court simply asked whether the jury still wanted the testimonies read back to them. Nothing in the record indicates the court was suggesting the readback was unnecessary or that it somehow did not want the jurors to have the readback.

As to the part of the communication when the court sent CALCRIM No. 3551 to the jury, respondent acknowledges that the court "should not have advised the jury on how to proceed following its declaration of deadlock until consulting with counsel." However, respondent argues that sending CALCRIM No. 3551 was harmless beyond a

11

reasonable doubt.  We agree.  "Although such communications violate a defendant's right to be present, and represented by counsel, at all critical stages of his trial, and thus constitute federal constitutional error, reversal is not required where the error can be demonstrated harmless beyond a reasonable doubt."  (*People v. Wright* (1990) 52 Cal.3d 367, 403, overruled in part on other grounds, as stated in *People v. Williams* (2010) 49 Cal.4th 405, 459; *Jennings*, *supra*, 53 Cal.3d at pp. 383-384; *Dagnino*, *supra*, 80 Cal.App.3d at p. 988 ["a trial court's instructions to a jury in a criminal case are given at a 'critical' stage of the proceedings and therefore, without the presence of counsel and absent a stipulation, comprise both constitutional and statutory error"]; see *Chapman v. California* (1967) 386 U.S. 18, 20-21.)[6]

In *Jennings*, *supra*, 53 Cal.3d 334 at pages 382-383, prior to excusing the jury for the day, the trial court discussed with the jury, without counsel present, its schedule for deliberations.  During the conversation, a juror indicated he had a " 'personal question.  If we come up to a[n] 11 to 1 decision on something . . . is that a mistrial or something or other?' "  (*Id*. at p. 382.)  The court answered " 'that would be considered a deadlocked jury' " on " 'that one particular count.' "  (*Ibid*.)  The court then urged the jurors to " 'try to reach a verdict on a count if it's possible,' " and if it came to " 'a point where you are

---

   [6] We note defendant's claim that the court's error in communicating with the jury outside his presence requires reversal without a showing of prejudice (i.e., the error was reversible per se).  In support of this claim, he cites *U.S. v. Cronic* (1984) 466 U.S. 648, *Bell v. Cone* (2002) 535 U.S. 685, and *Mickens v. Taylor* (2002) 535 U.S. 162.  However, these cases are inapposite since they concern the denial of effective assistance of counsel under the Sixth Amendment.  (*Cronic*, at pp. 653-659; *Bell*, at pp. 694-698; *Mickens*, at p. 166.)

unable to do so and need further assistance, then bring that to our attention, whether that involves just one count or inability to reach a decision as to one or more counts, or whatever the situation is.' " (*Id.* at p. 383.)

The defendant in *Jennings* contended this ex parte communication with the jury violated his federal constitutional rights to counsel, to be present, and to due process of law, similar rights under the state constitution, and various statutory rights. (*Jennings*, *supra*, 53 Cal.3d at p. 383.) The California Supreme Court concluded that this communication was harmless beyond a reasonable doubt for two reasons. First, it stated that "nothing in the [trial] court's admonition to the jury was an incorrect statement of law." (*Id.* at pp. 384-385.) The Court noted the trial court correctly explained that a deadlock on a single count would not affect the other counts, encouraged the jury to try to reach a verdict, and indicated that if the jury was unable to do so, it was simply to inform the court. The Court remarked, "Significantly, defendant does not explain in what manner the court's admonition was erroneous. Thus, the trial court's response to the juror's question did not implicate defendant's substantial rights."[7] (*Id.* at p. 385.) Secondly, the Court observed that the trial court "promptly notified defense counsel of its action and encouraged counsel to review the court reporter's notes and suggest a further admonition, if desired." (*Ibid.*)

---

[7] In his reply brief, defendant attempts to distinguish *Jennings* from the instant case by pointing out that the ex parte communication, in that case, was in response to a question about the consequence of a *hypothetical* deadlock, not an *actual* deadlock, as in this case. However, this is a distinction without a difference, especially in light of the *Jennings* court's reasons for finding the error harmless beyond a reasonable doubt.

13

In the instant case, after the jury put in writing that they were deadlocked, as instructed by the court, the court sent back CALCRIM No. 3551 without consulting with counsel. However, as in *Jennings*, the error was not prejudicial. The court simply sent a standard jury instruction that contained no misstatement of the law. (*Jennings*, *supra*, 53 Cal.3d at pp. 384-385; see *People v. Whaley* (2007) 152 Cal.App.4th 968, 984; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1118-1121.) The instruction was plainly appropriate, given that the jury had been deliberating for less than three hours when it announced it was deadlocked. Courts may generally ask a jury to continue deliberating if its initial proclamation of deadlock is preceded by "a relatively short period" of deliberations. (*People v. Breaux* (1991) 1 Cal.4th 281, 318, 320.) Furthermore, nothing in the instruction was designed to coerce the jury into returning a verdict. Instead, the instruction simply reminded the jurors of their duty to "deliberate with the goal of reaching a verdict if [they could] do so without surrendering [their] individual judgment." (See *Moore*, at p. 1121.) Additionally, the instruction directed the jurors to decide the case after they had "fully and completely considered all of the evidence," and to not change their positions "just because it differs from that of other jurors or just because you or others want to reach a verdict." Finally, the instruction told the jurors to let the court know if it could do anything to help them further, and then it simply stated, "Please continue your deliberations at this time." We note the trial court "made no remarks either urging a verdict be reached or indicating possible reprisals for failure to reach an agreement." (*Ibid*.)

14

Defendant claims the trial court's "irrational and impulsive decision to communicate with the deliberating jury without notifying defense counsel about the deadlock" was not harmless beyond a reasonable doubt since he did not request CALCRIM No. 3551, and the court had no sua sponte duty to give it. He also asserts that the jury's inquiries pertained to the evidence supporting the assault count, for which it ultimately found him guilty, and he avers that, had he been notified, he might have been able to communicate to the court "the importance of having the jury receive the readback before any further deliberation, and that deliberations were of sufficient duration to warrant mistrial on the assault charge." Defendant further claims the court's communications "caused the jury to change their verdict on count 1 from unable to agree to guilty." Nothing in the record supports defendant's claim that the court's communications caused the jury to change its verdict. Additionally, there was nothing improper about the court's instruction. Finally, the court reporter was preparing to do the readback of the testimonies, and the jury, not the court, decided not to have the readback anymore. The jury apparently had continued its deliberations, overcame whatever impasse it had reached in its previous deliberations, and reached a verdict without the readback. (See *People v. Lee* (1974) 38 Cal.App.3d 749, 756 ["during a reasonable delay in obtaining evidence which it wishes to consider, the jury may continue its deliberations and reach a valid verdict without the evidence it has previously requested"].)

In sum, no prejudice appears, and any error was harmless beyond a reasonable doubt. (See *Chagolla*, *supra*, 144 Cal.App.3d at p. 433.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


FIELDS _____
                                                                        J.


I concur:


CODRINGTON _____
          Acting P. J.

[*People v. Pereira*, E077293]

RAPHAEL, J., Dissenting.

After the jury announced a deadlock, the trial court abandoned the course of action agreed to by the parties—a readback of certain conflicting testimony, previously requested by the jury—and flew into action unilaterally, without informing the parties. It is undisputed that the court thereby violated the defendant's constitutional and statutory rights.

The trial court communicated with the jury twice, and it changed course in two ways. First, it sent the jury questions, received answers, and decided to cancel the readback. Second, it sent the jury a written copy of the standard instruction suggesting jurors reexamine their views. After these efforts, with just 40 minutes more deliberation, the jury broke its deadlock and convicted defendant and appellant Arnold Steven Pereira. The trial court disclosed what it had done only when the jury announced it had a verdict, the morning after the court's unilateral communications and decisions.

On appeal, the People agree with Pereira that there is "no question" the trial court should not have privately communicated with the jury. Unlike the majority, I am not satisfied beyond a reasonable doubt that the trial court's improper actions did not affect the outcome of the trial. The jury deadlock shows that one or more jurors had a firm "not guilty" vote, and we do not know what motivated the jurors on Pereira's side at any point. As discussed below, I find it plausible that, absent the trial court's improper communications, at least one juror would not have switched from acquittal to conviction.

1

I also do not think Pereira, denied the chance to object contemporaneously to the trial court's actions, forfeited his challenge. Even if we had the discretion to impose forfeiture for the failure to later object with a motion for mistrial, I would not choose to exercise that discretion. I therefore respectfully dissent, as I would reverse the assault conviction because of the trial court's improper jury communications.

## I. FACTS

A. *The Dispute at Trial*

The primary charge in Pereira's trial was assault with a deadly weapon on his nephew W.P.[1] Pereira swiped a knife downward through the air, directed at W.P. Pereira's main defense in closing argument turned on a disputed fact about how far he was from W.P. at that time.

Pereira asked the jury to credit W.P.'s testimony that Pereira was "seven to eight feet" away when he swiped the knife. W.P. testified to that fact three times and expressed no reservations about the matter.

In contrast, W.P.'s mother testified that Pereira was about two feet from W.P. at the time. W.P.'s mother was equivocal about the distance. When first asked at trial how close Pereira was when he swiped the knife, the mother answered: "To be honest, I don't remember because it happened so quick." After a few more questions, she agreed with the prosecutor that Pereira was "approximately two feet" away. She testified that she did

---

[1] Pereira also was convicted of vandalism, in violation of Penal Code section 594. The jury appears to have reached its guilty verdict on that charge before the events at issue in this appeal, and there is no reason to reverse that conviction.

2

not see how close the blade came to W.P.  She testified that she did not remember whether W.P. was standing or lying on the ground at the time, as the events "happened super quick; that's why I don't remember. . .details."  Still on direct examination, she acknowledged that she had provided contradictory statements and testimony about whether the stabbing attempt was in the living room or front lawn and when asked to explain that discrepancy said: "To be honest, I don't remember much of that day, besides the fact that he had the knives in his hand."  She admitted that her recollection of how Pereira attempted to stab W.P. was "[n]ot a hundred percent" and her memory of it was "fuzzy."

In closing argument, Pereira argued that the swiping of the knife did not satisfy the elements of the assault with deadly weapon charge beyond a reasonable doubt.  Relying on W.P.'s testimony about the distance, Pereira argued that the swiping was not an act that "by its nature, would directly and probably result in the application of force" to W.P., and, relatedly, that Pereira at that moment had no "present ability to apply force" to W.P. (CALCRIM No. 875.)  Pereira's counsel argued, "[f]rom that distance, ladies and gentlemen, at seven to eight feet, there is just no way.  There is no way that the knife was going to make contact with W.P."

Pereira's counsel emphasized W.P.'s mother's ambivalent testimony about the incident and her professed fuzzy memory of it.  In rebuttal, the prosecutor argued that it was "disingenuous" for Pereira to credit W.P.'s testimony about the distance while also arguing that W.P. was not credible on some other matters.  The prosecutor did not

3

directly defend the mother's credibility but argued that the jury should consider the testimony of W.P. and his mother and "formulate your determination of the case based upon the totality of evidence."

B. *The Deliberations and the Court's Unilateral Actions*

On the fifth day of trial, following closing arguments and instructions, the jury began to deliberate shortly before a lunch break.

The jury had been instructed that if they had "a disagreement about the testimony" they could "ask that the court reporter's record be read" to them. In the early afternoon, they sent two notes. In the first, the jury asked for testimony from both the mother and W.P. "regarding [Pereira] slashing the knife." In the second, they asked whether Pereira was arrested on the day of the incident.

After receiving these jury inquiries, the court met with counsel. The parties agreed to provide a readback of the testimony of the mother and W.P., and the court reporter began preparing that testimony for the jury. The court had stated that its readback procedure would be for the reporter to go into the jury room to read it.

While the court reporter was preparing the testimony in the mid-afternoon, the jury sent another note. The note stated that the jury was deadlocked on the assault with deadly weapon count and the jurors "don't think more time will help."

The court did not inform counsel of the deadlock note. Instead, the court privately communicated with the jury, sending the jurors two written questions. In the first, the court asked: "Do you still need the testimony read to you from your earlier question?"

4

In the second, the court asked: "Do you still need an answer to your second question?" The jury returned the paper with "no" written by each question. Based on those answers, the court decided not to provide the readback that the parties had agreed upon. The readback never occurred.

Next, the court unilaterally decided to communicate with the jury about the case for a second time. It sent a written version of the CALCRIM 3551 further deliberation instruction to the jurors, without reading it in open court. The instruction stated, among other things, "[d]o not hesitate to reexamine your own views" and that the jurors "may want to consider new approaches in order to get a fresh perspective." The jury then was excused for the day at 4:25 p.m., twenty-eight minutes after receiving that instruction.

The court did not disclose to the parties what it had done until the jury announced the next morning that it had a verdict.

C. *The Verdict*

The next morning, after spending just twelve more minutes deliberating, the jury announced it had a verdict. Before bringing the jury into the courtroom, the court disclosed to counsel its previously private jury communications. After doing so, it said, "I don't know if anybody wants to add anything. I just wanted to put that sort of sequence of events on the record."

The court addressed counsel: "Either side have anything to add about the history of the jury deliberations?" Each counsel responded negatively. The court said, "I don't know if either side would have objected to [CALCRIM] 3551. I thought time was of the

5

essence." The court said that it thought "that 3551 was appropriate, whether there was an objection from either side, or not. I will own that. . . ." The court asked if everyone was ready for the jury, and the lawyers said they were.

The jury returned a guilty verdict on both counts.

## II. DISCUSSION

A. *Private Judicial Communications with a Deliberating Jury Require Reversal Unless Harmless Beyond a Reasonable Doubt*

For decades, American courts have been "practically unanimous in holding that private communications between court and jury are improper, and that all communications should be made in open court." (*People v. Alcalde* (1944) 24 Cal.2d 177, 189.) Indeed, since 1872, Penal Code section 1138 has required that a deliberating jury that requests information "must require the officer to conduct them into court" and "the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." (Pen. Code § 1138; *People v. Weatherford* (1945) 27 Cal.2d 401, 417-418 [question-and-answer between jury and court through bailiff was "obviously violative" of section 1138, and "the practice in question must not only be condemned, but must be held to have constituted reversible error" as it was prejudicial]; *Paulson v. Superior Court* (1962) 58 Cal.2d 1, 7 ["informal communications between court and jury are improper"]; see also Cal. Rules of Court, rule 2.1036 [requiring instructions to jury that reports an impasse in deliberations be given "in the presence of counsel"].)

6

Our Supreme Court has held that a "court's failure to give notice or afford an opportunity to respond" to a jury inquiry is not only statutory error under Penal Code section 1138, but also constitutional error. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 68-69; *People v. Mickle* (1991) 54 Cal.3d 140, 174 [statutory and constitutional violation "where the court actually provides the jury with instructions or evidence during deliberations without first consulting counsel"]). The error implicates the right to counsel because, if informed, the defendant's counsel could act to influence the court's procedures; secret jury communications also implicate the defendant's right to personal presence at all trial proceedings. (*People v. Hawthorne*, *supra*, 4 Cal.4th at p. 69.)

With constitutional error at issue, the Court of Appeal has required reversal unless the error is harmless beyond a reasonable doubt. As a "[c]ommunication between judge and jury during deliberations without affording defendant and counsel an opportunity to be present impinges on a defendant's constitutional right to the assistance of counsel," a court must reverse unless "satisfied beyond a reasonable doubt that the error did not contribute to the verdicts." (*People v. Chagolla* (1983) 144 Cal.App.3d 422, 432; *People v. Dagnino* (1978) 80 Cal.App.3d 981, 989-990 [finding error not harmless where court privately provided supplemental instructions to a deliberating jury].) In "determining the harmfulness of error when a judge communicates with the jury outside the presence of counsel. . .'prejudice will be presumed where the denial "may have affected" the substantial rights of the accused. Only the "most compelling showing" to the contrary will suffice to overcome the presumption, and courts will not engage in 'nice

7

calculations' in making such a determination.'"  (*People v. Stewart* (1983) 145 Cal.App.3d 967, 973.)

B.  *There is a Reasonable Doubt that the Outcome Would Have Been Different Had the Readback Occurred*

We do not know what occurred in the jury room, so we must evaluate reasonable doubt by considering reasonable possibilities.  There were only a few hours of deliberations in total, and in the midst of them, the jury declared that it was deadlocked and stated "[w]e don't think more time will help."  That tells us that, at that time, there were some number of jurors with a firm view that Pereira was not guilty.

We also know that, shortly before reporting the deadlock, the jury had asked for a readback of testimony from W.P. and his mother about Pereira's slashing the knife. These were the two people whose testimony clashed as to the distance that Pereira was from W.P. at that moment.  The dispute about this distance was central to the closing arguments, as Pereira's counsel relied on W.P.'s testimony that Pereira was then seven or eight feet away to argue that "[f]rom that distance. . .there is just no way that the knife was going to make contact with W.P."

Had the readback occurred, the jury would have re-heard W.P.'s unequivocal and thrice-repeated testimony that the distance was seven or eight feet.  The jury would also have heard the various caveats that came with his mother's testimony that Pereira was about two feet away.  Those qualifiers were all volunteered on direct examination.  She initially stated that she didn't remember the distance "because it happened so quick."

8

She reiterated that the events "happened super quick; that's why I don't remember. . .details," including whether W.P. was standing or lying down when the knife slash happened. She also conceded that, "[t]o be honest, I don't remember much of that day, besides the fact that he had the knives in his hand." Her memory of the incident was "[n]ot a hundred percent" and "fuzzy."

It thus seems a reasonable possibility that the readback would have hardened the views of the juror or jurors who, at the time of the deadlock, believed Pereira was not guilty. It is a reasonable possibility that these jurors had the view advanced by Pereira in closing argument, which was that he was far enough away from W.P. that his knife slash in the air would not "directly and probably result in the application of force" to W.P. Rehearing the uncertain testimony from W.P.'s mother could well have bolstered those jurors' resolve (or attracted more to their side), leading, at least, to a hung jury rather than to a conviction. (See *People v. Butler* (1975) 47 Cal.App.3d 273, 280-281 [conviction reversed due to failure to provide requested readback to jury, because "logic and common sense warrant the assumption that one or more of the jurors, in agreeing to the verdicts" may have engaged in "speculation or surmise" about the testimony or "may have surrendered their independent judgment to those who professed better hearing and memory"].) A hung jury, as opposed to an acquittal, is a more favorable outcome for purposes of determining harmless error. (*People v. Hendrix* (2022) 13 Cal.5th 933, 947, fn.6.)

Absent the court's improper communications with the jury, the jury could have

9

received the readback in one of two ways. First, when the court received the jury's deadlock note, the court reporter was preparing the testimony for readback, and the court could simply have allowed that readback to go forward as the parties agreed. It could have discussed the deadlock note with the parties after the readback, or with counsel while the court reporter was reading back testimony in the jury room.

Second, the court could have conferred with counsel to discuss the deadlock note before any readback. If so, counsel could have opposed the court's idea of sending interrogatories to the jurors and supported simply providing the readback as agreed. Counsel might well have opposed providing the CALCRIM 3551 instruction to the deadlocked jury unless the jury remained deadlocked after the readback. Counsel might also have requested and been granted the chance to offer additional argument focused on the "specific concerns which, if resolved, might assist the jury in reaching a verdict." (Cal. Rules of Court, rule 2.1036(a), (b).) The trial court's unilateral actions foreclosed any such possibility.

Importantly, nothing in our record supports the trial court's explanation that it had to act alone to give the jury the CALCRIM 3551 instruction because "time was of the essence." The court apparently sent that instruction to the jury at 3:57 p.m. when the jury had been deliberating for less than three hours (not counting breaks). Even without that instruction, the jury simply could have come back to resume deliberations the next morning, as it in fact did.

It should not matter that, upon receiving the court's interrogatories, the jury

10

responded that it no longer thought the readback would resolve its deadlock.  That answer indicates the jury thought that its impasse had grown so entrenched that *even the readback it had recently requested would not resolve it*.  The jury also thought that more time would not help.  Yet the jury *did* reach a verdict after more time.  We simply do not know what would have happened if the jury had received the readback.  While perhaps the jury would still have broken its deadlock by convicting, the readback instead could have reinforced the purportedly intractable conflict in the jury room, leading to a more favorable outcome for Pereira.[2]  For these reasons, I would reverse his assault conviction.

C. *We Should Not Find a Forfeiture*

Pereira had no contemporaneous opportunity to object to the trial court's private communications with the deliberating jury and its decision not to provide a readback.  The court did not disclose its afternoon communications and decisions until the next morning, after the jury reached a verdict.  That obviously excuses the failure to make a contemporaneous objection to the trial court's actions, which were hidden from counsel.

---

[2]  As a loose analogy, imagine a group of people cannot decide on which restaurant to dine at together.  They are somewhat familiar with the options, but their recollections are hazy, so they ask to see menus from the restaurants.  While waiting for the menus, however, they confer and decide that their culinary preferences are so divergent that they will be unable to reach a decision, even with menus.  They ask, instead, to forgo picking a restaurant and disperse to their homes for dinner.  Told that they may not go home, and asked instead to reexamine their views, they—growing hungrier—agree to dine at Restaurant A.  That settled the matter, but it does not mean that the menu information would not have led to a different outcome.  Perhaps, seeing the menu entrées, the hungry diners would have all preferred a different place, or perhaps a diner would have vetoed Restaurant A, made certain by the menu she did not wish to eat there.  When they said they did not need the menus, *it was because they had given up and asked to go home.*

11

In *People v. Ross* (2007) 155 Cal.App.4th 1033, 1048, the court rejected an argument that the defendant forfeited an objection to an instruction a court provided to a deliberating jury without informing counsel, noting that "[n]o well-reasoned case predicates a forfeiture of a similar objection upon similar conduct" and stating that the forfeiture rule "obviously cannot apply unless it appears counsel was aware of the court's response at or before the time it was effected."

Today's opinion still holds that Pereira has forfeited his appellate challenge. It finds a forfeiture because counsel failed to interpose an objection to errors occurring during deliberations when they were revealed to counsel *after* the jury had reached a verdict (but before the verdict was announced). I have not discovered any appellate authority deeming an issue forfeited in similar circumstances.

Here, defendant's momentary chance to object came well after the damage was done. When called into court for the morning verdict, the last thing Pereira's counsel had been told (as far as we know) was that the agreed-upon readback was to proceed the previous afternoon in the jury room. As the jury was poised to return its verdict, Pereira could have objected as the court unspooled the events that had ended the day—the deadlock note, the interrogatories to the jury, the decision to cancel the readback, and the written instruction encouraging reexamining juror views. For several intertwined reasons, the failure to do so should not forfeit an appellate challenge.

First, the court's denial of an opportunity for a contemporaneous objection transformed the nature of any objection. Had counsel been present before the court acted,

12

Pereira could have attempted to have the readback go forward, (with or without additional argument by counsel), the idea of interrogatories to the jury squelched or modified, and the further deliberations instruction deferred. Pereira might have influenced the course of the court's decisions on these matters—and, indeed, the People might have agreed—without derailing the entire case. Even if the trial court had disclosed the communications tardily but still "while the jury was deliberating and long before the verdicts were returned" (*People v. Chagolla*, *supra*, 144 Cal.App.3d at p. 433) defense counsel might still have had a chance to make an effective objection, such as by at least asking to provide the readback the parties had agreed to. But Pereira learned of the court's improper communications only after the jury announced it had a verdict. Once the jury had reached a verdict, further instruction or a readback or additional argument is not a plausible or effective remedy to seek. An objection meant requesting a mistrial. The jury, waiting to return its verdict, would be sent home. When the opportunity for a contemporaneous objection during trial is denied, it is no substitute to provide an opportunity to object as the jury lines up to enter the courtroom to announce its verdict. We enter untrodden territory by denying appellate rights here.

Secondly, the court did not, strictly speaking, allow for an objection, and it even indicated that an objection would be futile. The court disclosed the chronology of its private communications with the jury and asked if either party had anything to add "about the history of the jury deliberations." The court then told the parties that it thought giving the CALCRIM 3551 instruction was appropriate "whether there was an objection from

13

either side, or not" and asked if everyone was ready for the jury to come in. While it would have been possible for Pereira to interpose an objection, doing so would not have been responsive to the court, which announced that an objection would not have made a difference, at least as to one of its actions. We should not find forfeiture where counsel did not object to the court's unanticipated, completed actions when disclosed in a way that indicated an objection would be futile.

Third, we should not find a forfeiture due to the unsettling fact that the court acted beyond the waiver of presence that it had obtained from Pereira just hours earlier, when the jury began deliberating. (See *People v. Bradford* (2007) 154 Cal.App.4th 1390, 1411 [no appellate waiver where trial judge's jury communications exceeded the scope of defendant's waiver of his presence].) The court obtained Pereira's consent to waive his presence for "routine things" such as jury questions. But the court told Pereira that "if they indicate they can't reach a verdict" then defense counsel will make arrangements for him to be present. The jury indicated that it couldn't reach a verdict later that day, yet the court acted without anyone present, outside the scope of Pereira's waiver. In the same vein, the court also assured Pereira that for routine matters, Pereira's waiver would leave it to his counsel to decide when he wants Pereira present. But by taking actions without counsel, the court deprived counsel of that decision. Forfeiture is inappropriate where the court acted in violation of the defendant's right to be present for court proceedings, which would have provided the chance for a contemporaneous objection.

14

Finally, even if we thought the objection forfeited, we should exercise our discretion to hear this appeal, as "[Penal Code] section 1259 allows us to reach the merits of any claim of instructional error that potentially affects a party's substantial rights." (*People v. Amezcua & Flores* (2019) 6 Cal.5th 886, 916; see also *People v. Bradford*, *supra*, 154 Cal.App. at p. 1410 [suggesting that counsel cannot waive the defendant's challenge to trial judge's ex parte instruction of jurors]; *People v. Knighten* (1980) 105 Cal.App.3d 128, 132 [significance of issue of court's improper private communication with jury "arguably sufficient to negate the waiver" by failure to object].)

### III.  CONCLUSION

The jury here declared itself deadlocked and thought more time would not help. They were wrong: after about an hour more of deliberation, they convicted Pereira.

The question before us is not what I or other members of the panel think of the strength of the evidence.  Due to the deadlock note, we *know* that one or more jurors articulated an adamant view that Pereira was not guilty.  The question is whether we have a reasonable doubt as to whether those jurors would have changed their vote to guilty, as they did, absent the trial court's improper solo actions during their final hour of deliberations.

I am not persuaded beyond a reasonable doubt that the trial court's private jury communications were harmless, and I find no appropriate basis to deem Pereira's challenge to those errors forfeited.  I therefore respectfully dissent.

RAPHAEL          
J.

15