Filed 10/20/25  P. v. Gonzalez CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AAREN GONZALEZ,<br><br>    Defendant and Appellant. | B337608<br><br>(Los Angeles County Super. Ct. No. TA160992) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael D. Abzug, Judge.  Reversed.

Michael Reed, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Jonathan M. Krauss and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

Mere presence at the scene of a crime is insufficient to establish participation in a conspiracy to commit that crime or aiding and abetting its commission.  (*People v. Ware* (2022) 14 Cal.5th 151, 165 ["Because the law will not recognize a rule of guilt by association, we insist on proof of a defendant's knowledge of, and specific intent to further, [a conspiracy's] unlawful ends"]; *People v. Francis* (1969) 71 Cal.2d 66, 72; *In re Michael T.* (1978) 84 Cal.App.3d 907, 911 ["Mere presence at the scene of a crime which does not itself assist its commission or mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting"].)  We consider whether the People presented substantial evidence of more than mere presence with respect to defendant and appellant Aaren Gonzalez (defendant), who was convicted at trial of conspiracy to commit murder, four counts of attempted murder, and a firearm possession offense.

## I.  BACKGROUND

### A.  *The Offense Conduct, as Established by the Evidence at Trial*

Los Angeles Police Department (LAPD) officers Francisco Lozano and Lester Castillo were on patrol in Los Angeles County on the evening of September 22, 2023.  Shortly before 8:00 p.m., they were traveling westbound on 108th Street, approaching Stanford Avenue.  This stretch of 108th Street is primarily residential, with one lane of traffic in each direction, a left turn lane down the middle of the street, and curb parking on either side.

The officers saw a Lexus, which was traveling in the opposite direction on 108th Street, stop in the roadway next to a

parked Mercedes. While the officers were driving toward the Lexus from the opposite direction, the Lexus's passenger rapidly fired multiple gunshots (estimated to be between seven and nine) at the Mercedes. There were no cars behind the Lexus, and the appellate record (including video footage from the officers' dash camera) does not reveal for how many seconds the Lexus was stopped.

After the gunshots, the Lexus sped off eastbound on 108th Street and the officers gave chase. Less than one minute later, the Lexus collided with a vehicle at 107th and Wadsworth—as circumstances would have it, the same Mercedes targeted in the shooting. The Lexus continued for another half block after the collision and, at that point, defendant exited the driver's side and Davion McFarlan (McFarlan) exited the passenger side. Both fled on foot, splitting up as they ran,[1] and McFarlan threw or dropped a handgun as he fled.

While the police officers on scene called for back-up, they observed at least four people get out of the Mercedes that had been fired on; one of those people told an officer he had been shot in the arm and stomach. The Mercedes's other occupants left the scene without identifying themselves, and no weapons were found in the Mercedes or on the shooting victim.

The police recovered the gun discarded by McFarlan and found it had a "double feed malfunction." This type of malfunction "occurs when a pistol or firearm is fired rapidly and

---

[1] The police apprehended defendant on 106th Street "just east of Wadsworth" and McFarlan on 107th Street east of Wadsworth.

two rounds . . . attempt to enter the chamber at the same time," which causes the weapon to jam.

### B. *McFarlan's Jail Call*

Defendant and McFarlan were charged with conspiracy to commit attempted murder, four counts of attempted murder (corresponding to four occupants of the Mercedes), and firearm offenses. Both men were tried together. None of the Mercedes occupants who were shot at testified during trial.

The prosecution did introduce in evidence a recording of a phone call McFarlan made from jail a few days after he was arrested.[2] The call, which lasted about five minutes, was between McFarlan, a woman McFarlan referred to as "mama," and a man who addressed McFarlan as "nephew."

During the call, McFarlan's mother asked him "what happened when [he] left." She said she "kn[e]w pretty much everything" and the "Citizen App" said "it's connected to some shit. The boy getting shot at Marco?" McFarlan answered, "I don't know." McFarlan's mother remarked, "They got you for attempted murder," and McFarlan responded, "Yeah."

McFarlan's uncle asked, "Why," and his mother cut in to say, "Yeah, because that's what she Amaya saying. . . . Did they catch him? Did they find anything on you?" McFarlan responded, "not on me," and his mother said, "But they found something somewhere." McFarlan remarked, "I think so." McFarlan's uncle asked, "Did you use it? Yes or no? Did you use

---

[2] There was no objection that the jury could not consider the call made by McFarlan against defendant (who was not a party to the conversation).

it? Yes or no?" McFarlan said "Huh?" and his uncle repeated, "Did y'all use it? Yes or no?" McFarlan grunted in response. Moments later on the call, the uncle asked, "Nephew? Yeah, nephew. Was it a green—was it a go or no? Did it go or no?" McFarlan responded, "I don't talk over this phone. Huh? Whatever they got me in here for. That's what it is."

Los Angeles Police Department detective Mario Leonidas, who testified that he investigated hundreds of gang-related crimes, was asked to offer an opinion on the meaning of the "go or no" exchange between McFarlan and his uncle. The detective testified that, "based on talking to arrestees[ and] victims, when they say, 'It's a go or no,' it's indicating, like, a mission, for example, like, a drive-by shooting or a shooting, if it's a go, if they actually did what they were supposed to do. [¶] So in this case that means to me, based on . . . my experience, the mission they were on that day to do that shooting was—were they able to accomplish or not?" That limited opinion was the only expert testimony presented at trial. There was no testimony that defendant or McFarlan (or any of the occupants of the fired-upon Mercedes) were members of a criminal street gang.

### C. Verdict and Sentencing

The prosecution argued McFarlan was the one who shot at the Mercedes and defendant was guilty of the four charged attempted murders as an aider and abettor (and a conspirator who planned with McFarlan in advance to commit murder). The jury found defendant guilty as charged, convicting him of

conspiracy (Pen. Code,[3] § 182, subd. (a)(1)), four counts of willful, deliberate, and premeditated attempted murder ( §§ 664, 187, subd. (a)), and possession of a firearm with a prior violent conviction (§ 29900, subd. (a)(1)).  The trial court sentenced defendant to concurrent terms of life and 25 years to life on the attempted murder and conspiracy counts, respectively.  The court imposed a concurrent two-year prison term for the firearm offense.

## II.  DISCUSSION

At trial, all the evidence was that McFarlan was the shooter.  Nobody who was in the Mercedes testified.  There was no evidence about the nature of defendant and McFarlan's relationship (beyond the evidence that they were in a vehicle together and ran in different directions when chased by the police after McFarlan shot at the Mercedes).  As the prosecution conceded during closing argument, there was no evidence about the motive for the shooting.[4]  There was also no expert testimony concerning whether or not a driver of a vehicle would ordinarily be aware that one of his passengers was carrying a firearm.  In light of these evidentiary deficits, the prosecution did not present substantial evidence defendant knew McFarlan was armed or

---

[3]     Undesignated statutory references that follow are to the Penal Code.

[4]     The detective did offer limited opinion testimony about the meaning of the "go or no" question posed by McFarlan's uncle on the recorded call, but there was no evidence McFarlan's uncle—or defendant or McFarlan—were gang members.

intended to kill anyone.  As we explain, the criminal judgment against defendant must accordingly be reversed.

### A.    *Standard of Review*

"When a defendant challenges the sufficiency of the evidence for a jury finding, we review the entire record in the light most favorable to the judgment of the trial court.  We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt.  [Citation.]  '"The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence."'  [Citation.]"  (*People v. Vargas* (2020) 9 Cal.5th 793, 820.)

### B.    *Attempted Murder Convictions*

"'[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill.'  [Citation.]"  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.)  "Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime."  (*People v. Canizales* (2019) 7 Cal.5th 591, 602; accord *People v. Smith* (2005) 37 Cal.4th 733, 741 ['"Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions"'].)

7

The mere fact that defendant stopped the Lexus in the roadway alongside the parked Mercedes does not demonstrate defendant knew McFarlan was armed, knew McFarlan intended to kill any occupants inside the Mercedes, or shared that intent. The Attorney General's suggestion that McFarlan's jail call may be read to include an "adoptive admission to his uncle that *they* were on a mission[,] . . . suggest[ing] a shared purpose that [McFarlan] and [defendant] carried out together," is unfounded. Assuming McFarlan's statements can be construed as a tacit admission of his own culpability for attempted murder, none of McFarlan's statements indicates *defendant* knew he was armed or had any knowledge of his plans until he started firing. Even if the jury could conclude from the recorded call and opinion testimony that McFarlan was on a "mission," nothing in the call or the expert testimony provides a rational basis to infer McFarlan and defendant were on a *shared* mission.

The Attorney General also suggests that defendant "waited for McFarlan to finish firing as many shots as the gun allowed before he sped off," but this is not a fair characterization in light of the evidence presented on the rapidity of the shooting. McFarlan fired between seven and nine shots so quickly his gun jammed, and the seconds this took means the "wait[ing]" that the Attorney General postulates is just as easily explained as a short period of shock at an unexpected event—presumably no more than a couple seconds.[5]

---

[5] The Attorney General compares this case to *People v. Campbell* (1994) 25 Cal.App.4th 402, in which the defendant and a co-defendant walked by a man and a woman, circled back, the defendant stood in front of the two victims when the co-defendant pulled a gun and demanded money, and the defendant robbed the

The circumstances of defendant's flight fail to fill in the wide evidentiary gaps. Defendant fled the scene of the shooting with McFarlan still in the car, but he and McFarlan ran off in different directions after they collided with the Mercedes. To be sure, the split between defendant and McFarlan could have been undertaken in the hope of better avoiding capture, but it is still incorrect, as the Attorney General says, that defendant "made no attempt to distance himself from McFarlan." By all appearances based on the evidence, defendant disassociated himself from McFarlan at the earliest practical opportunity following the shooting. (See *People v. Lara* (2017) 9 Cal.App.5th 296, 321-323 [holding that two defendants' decision "to flee the scene of a shooting" together in a car "[did] not support a reasonable conclusion they did so because of a consciousness of guilt rather than simple self-preservation or a desire to disassociate themselves from what had just occurred" because "[i]t would have made little sense for [them] to have fled the scene on foot when . . . [they had access to] a more efficient means of leaving the dangerous situation"].) Regardless, defendant's flight after the fact while being pursued by the police cannot be substantial evidence about what he knew before the shooting started.[6]

woman after the co-defendant ran off in pursuit of the fleeing man. (*Id.* at 409-410.) The Court of Appeal held this evidence was sufficient to establish the defendant "played an affirmative supportive role in the attempted robbery" of the male victim. (*Id.* at 410.) Defendant's conduct in this case—stopping the car and failing to drive off immediately upon the firing of seven to nine rapid shots—is not analogous.

[6] The Attorney General's citation of *People v. Chagolla* (1983) 144 Cal.App.3d 422 is inapposite. In *Chagolla*, it was "farcical" to

9

We have discussed the points argued by the Attorney General individually but considered them collectively. So considered, there is still insufficient evidence supporting defendant's four attempted murder convictions.

### C.     Conspiracy Conviction

The crime of conspiracy "has four elements: (1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator. [Citations.]" (*Ware*, *supra*, 14 Cal.5th at 163.) "The first element, concerning the existence of

---

suppose the defendant was "oblivious of what was going on" with respect to a drive-by shooting carried out by his brother in light of evidence that the brothers and another person cruised the neighborhood for several hours prior to the shooting, defendant yelled "Northside" and his brother pointed a gun at witnesses prior to the shooting, and the group was arrested after driving by the site of the shooting over an hour later. (*Id.* at 429.) The facts here are entirely different. In addition to the lack of any evidence concerning the relationship between defendant and McFarlan or their conduct prior to the shooting, defendant had no realistic opportunity between the shooting and the collision to disassociate himself from McFarlan.

The Attorney General also suggests defendant's failure to immediately eject his armed passenger from the car he was driving is analogous to cases in which the defendants fled *on foot* in the company of others. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 4-5; *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1095.) The factual scenarios are not comparable, and, as we have said, defendant and McFarlan separated when they were on foot.

an agreement, 'is the crux of criminal conspiracy.'  [Citation.]"
(*Ibid*.)  The agreement may be express or tacit.  (*People v. Maciel*
(2013) 57 Cal.4th 482, 516.)  No direct evidence is required, and
"such agreement must often be proved circumstantially." (*People
v. Homick* (2012) 55 Cal.4th 816, 870.)

As we have already discussed, there is no evidence of
defendant's relationship to McFarlan, any shared interest (such
as membership in a gang), or their conversation or activities
preceding the shooting.  There is no basis to infer defendant knew
who was in the Mercedes—or, really, whether it was even
occupied at all.  The bare facts that defendant stopped the car
next to the Mercedes and drove off after McFarlan quickly fired
between seven and nine shots do not support an inference that he
agreed to commit murder.

### D.     Firearm Conviction

Penal Code section 29900, subdivision (a)(1) makes it a
felony for "any person who has been previously convicted of any
of the [violent] offenses listed in Section 29905" to "own[ ] or
ha[ve] in possession or under custody or control any firearm."
Here, defendant stipulated to having suffered a qualifying
conviction and there is no evidence that he owned a firearm, so
the sole issue is whether defendant had actual or constructive
possession of the gun McFarlan fired from the car he was driving.

"""A defendant has actual possession when the weapon is in
his [or her] immediate possession or control,"' i.e., when he or she
is actually holding or touching it.  [Citations.]" (*People v. Bay*
(2019) 40 Cal.App.5th 126, 132.)  "To establish constructive
possession, the prosecution must prove a defendant knowingly
exercised a right to control the prohibited item, either directly or

11

through another person.  [Citations.]  Possession may be shared with others.  [Citation.]  But mere proximity to the weapon, standing alone, is not sufficient evidence of possession.  [Citation.]" (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417, disapproved on another ground in *People v. Farwell* (2018) 5 Cal.5th 295, 304, fn. 6.)

There is no evidence defendant ever had the gun in his actual possession and the Attorney General's argument that he had constructive possession of the gun is largely based on the unsupported premise that he and McFarlan were on a joint "mission."  As we have already discussed, however, there is no evidence concerning defendant's relationship to McFarlan and no evidence (even expert testimony) that McFarlan displayed the gun for any appreciable period of time before rapidly opening fire on the Mercedes.  In the absence of such evidence, there is no basis to infer defendant knew McFarlan was armed and no proper evidentiary predicate for defendant's firearm conviction; nothing about the gun's physical features suggests defendant must have seen it before McFarlan started shooting.  (Compare *People v. Miranda* (2011) 192 Cal.App.4th 398, 410-411 [holding it was reasonable to infer the defendant was aware of gun in car because, "after all, [it] was a shotgun not a handgun"].)

The Attorney General relies on cases generally endorsing the inference that a driver must be aware of and have the right to control prohibited items inside a car, but the evidence of the drivers' knowledge in these cases is significantly stronger than merely stopping a car in a roadway and fleeing after a passenger with an unknown relationship to the driver fires a gun.  For example, in *People v. Austin* (1994) 23 Cal.App.4th 1596, the defendants were in constructive possession of cocaine in the

12

trunk of a car where they used a key taken from an undercover officer held at gunpoint to open it. (*Id.* at 1609.) In *Miranda, supra*, 192 Cal.App.4th 398, the jury could reasonably infer the defendant was aware of a shotgun inside a Ford Escort based on its size. (*Miranda, supra*, at 411.) In *People v. Gant* (1968) 264 Cal.App.2d 420, the defendant driver of a stolen car was held to be in constructive possession of stolen guns hidden in the car based on his attempt to evade police, his "t[aking] charge when asked by [a police officer] concerning the ownership and possession of the car," and his conflicting statements to the officer. (*Id.* at 424-425.) The only case the Attorney General cites that is remotely comparable to this case is *People v. Taylor* (1984) 151 Cal.App.3d 432, in which the defendant was held to be in constructive possession of a gun that his passenger threw from a car in which they were joyriding shortly after police started chasing them. (*Id.* at 436.) Unlike this case, however, there was evidence the defendant in *Taylor* knew he and his passenger were committing a crime even before the gun was produced.

13

DISPOSITION

The judgment is reversed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.


We concur:



HOFFSTADT, P. J.



KIM (D.), J.